Jeffrey S. ABRAHAM, As Trustee of the Law Offices of Jeffrey S. Abraham Money Purchase Plan Dated 12/31/99 f/b/o Jeffrey S. Abraham, On Behalf of Himself and a Class of All Others Similarly Situated, and Derivatively on Behalf of Nominal Defendant Sport Supply Group, Inc., Plaintiff,

v.

EMERSON RADIO CORP., Geoffrey P. Jurick, Arthur J. Coerver, Harvey Rothenberg, Collegiate Pacific, Inc., and Michael J. Blumenfeld, Defendants,

and

Sport Supply Group, Inc., Nominal Defendant.

C.A. No. 1845–N.

Court of Chancery of Delaware, New Castle County.

Submitted: June 23, 2006.
Decided: July 5, 2006.

Carmella P. Keener, Rosenthal, Monhait & Goddess, P.A., Wilmington, DE; Laurence D. Paskowitz, Paskowitz & Associates, New York City, for Plaintiff.

Donald J. Wolfe, Jr., Brian C. Ralston, Kirsten A. Lynch, Potter Anderson & Corroon, L.L.P., Wilmington, DE; Steven M. Hecht, Sally J. Mulligan, Lowenstein Sandler, P.C., Roseland, NJ, for Defendants.

OPINION

STRINE, Vice Chancellor.

In this opinion, I address a claim against a sporting goods company's controlling stockholder that sold its control bloc for a premium to a strategic buyer that also operated in that same market space. According to the conclusory allegations of the complaint, the buyer somehow misused its control of the acquired subsidiary to usurp its assets for the buyer's benefit and to the unfair detriment of the subsidiary's other stockholders. The plaintiff alleges that the controller should have suspected that the buyer had improper designs for the subsidiary simply because the buyer announced its intention to capitalize on the synergies between the buyer's operating assets and those of the subsidiary. In fact, the plaintiff refuses to stop short of advocating that a selling controller should be deemed, as a matter of law, to be on notice that any buyer who is also a competitor likely has improper motives.

The former controller and its major stockholder and CEO have moved to dismiss the claims against them. Although I reject their argument that the complaint should be dismissed on demand excusal grounds, I agree with their argument that the complaint fails to state a claim. Even assuming for the sake of argument that a controlling stockholder can be held liable for negligently selling control to a buyer with improper motives (as opposed to when it knows it is selling to a looter or an otherwise dishonest and predatory buyer), the plaintiff has failed to state a claim. The complaint is devoid of facts supporting a rational inference that the controller should have suspected that the buyer, another listed public company, had plans to extract illegal rents from the subsidiary. At most, the complaint pleads facts suggesting that the controller knew that it was selling to a strategic buyer who would

attempt to capitalize on possible synergies between itself and its new non-wholly owned subsidiary.[1] That mundane prospect provides no rational basis for a seller to conclude that the buyer intends to embark on a course of illegal usurpation of the subsidiary's assets for its own unfair benefit. As a result, even assuming a negligence-based theory of liability exists under our law in these circumstances, the complaint is not viable. Under Delaware law, a controller remains free to sell its stock for a premium not shared with the other stockholders except in very narrow circumstances. The complaint here fails to plead facts supporting the existence of such circumstances. Therefore, it is dismissed.

## I. *The Complaint's Recitation Of Facts*

The following recitation of facts is drawn from the plaintiff's complaint.

The plaintiff is a long-term owner of thousands of shares of nominal defendant Sport Supply Group, Inc.[2]

Sport Supply was founded in 1972 by defendant Michael J. Blumenfeld, who served for several decades as the company's chief executive officer. It went public in 1991 and obtained a listing on the NAS-DAQ. In 1996, defendant Emerson Radio Corp. obtained a controlling interest in Sport Supply, and Blumenfeld stepped down as CEO. He was replaced by defendant Geoffrey P. Jurick, who was Emerson's CEO and controlling stockholder. Through open market purchases, Emerson increased its ownership of Sport Supply into a majority position by 2002, and by 2005, it owned 53.2% of the shares.

As of the period relevant to the case, Sport Supply had become the nation's largest direct marketer of sporting goods to bulk buyers, such as schools, universities, youth leagues, military bases, and amateur sport teams. Sport Supply's franchise is built on direct catalog and internet sales, having established a successful business-to-business marketing operation through an internet site that has won industry awards.

Despite its market niche, Sport Supply, rather than enjoying profits, suffered losses in the early part of this century. Therefore, in 2003, Sport Supply undertook a strategy to increase sales, reduce expenses, and return to profitability. In early 2004, as part of that strategy, Sport Supply voluntarily delisted its stock, thereby reducing the administrative and regulatory costs attendant to the status of a listed company, but also eliminating many of the integrity-assuring and informational benefits resulting from the regulatory regime for public companies. Following delisting, Sport Supply shares traded on quotes in the pink sheets. Nonetheless, Sport Supply's board and managers portrayed the move as a net gain for all stockholders, as the benefit from the increased marginal profitability resulting from lower regulatory costs was thought to exceed the value of the lost regulatory protections.

The strategy to increase Sport Supply's profitability began to show results in late 2004, when the company reported its first profit in years. The price of the company's shares increased from the $1–2 range to $3 per share very late in the year. The plaintiff alleges that even at this higher price, Sport Supply shares suffered from

---

**1.** In point of fact, as discussed later, the complaint does not even plead what wrongful use of the subsidiary's assets the buyer made after acquiring control.

**2.** This could mean that the plaintiff's stake is worth less than $10,000. The plaintiff now owns 3,000 shares.

the discounts usually imposed by the market on the shares of companies with thin floats, trading on the pink sheets, and with a majority stockholder. Nonetheless, by mid–2005, Sport Supply continued to improve its performance, remaining profitable and seeing its share price increase to $3.65 per share.

Then, on July 5, 2005, the event that largely inspires this complaint occurred. Emerson announced that it had sold its majority stake, some 4.75 million shares, for $32 million, or $6.74 per share. The premium to the prior day's closing price of Sport Supply stock was 86%.

The buyer was defendant Collegiate Pacific, Inc. Collegiate Pacific participates in the same industry as Sport Supply, and it just so happened that Sport Supply's founder and long-time CEO, defendant Blumenfeld, was Collegiate's CEO and largest stockholder. According to the complaint, which is cursory on this point, Collegiate "engages in the manufacture, marketing, and distribution of sporting goods and equipment and soft goods, as well as physical education, recreational, and leisure products to the institutional market in the United States."[3] Without detail, the complaint also indicates that Collegiate is a "competitor [of Sport Supply] with interests in many similar lines of business."[4] The shares of Collegiate are listed on the American Stock Exchange.

In the sales agreement with Collegiate, Emerson agreed that all the Sport Supply directors would resign and be replaced by directors selected by Collegiate. Collegiate used its new voting power to designate its chief operating officer and director, de-fendant Arthur J. Coerver, and its vice president of marketing and director, defendant Harvey Rothenberg, as directors of Sport Supply. The complaint does not allege who the other directors, if any, of Sport Supply were after July 2005,[5] and alleges that Coerver and Rothenberg either constituted the entire board or at least a majority of it.

According to the complaint, Emerson was aware that Collegiate's interest in Sport Supply did not involve simply its desire to own a majority of Sport Supply's stock. Rather, Collegiate believed there to be value in Sport Supply's assets, which, used under Collegiate's management, could generate value. To this point, the complaint quotes from a July 5, 2005 Collegiate press release (the "July Press Release"):

Adam Blumenfeld, President of Collegiate Pacific, commented further: *"This transaction places a multitude of valuable assets under Collegiate Pacific's managerial umbrella.* Among them:

— Combined customer count of 175,-000+

— *Proprietary Customer Lists and Trade Names* including MacGregor, Voit, Champion Barbell Company and Port–a–Pit Track and Field.

— Industry–Leading Catalog Brands such as BSN Sports and US Games.

— Substantial, Scalable Distribution Platform including a 180,000 sq. ft. facility located ¼ mile from Collegiate Pacific Headquarters.

---

3. Compl. ¶ 19.

4. *Id.* at ¶ 25.

5. At oral argument, counsel for Emerson and Jurick indicated that Sport Supply had added independent directors to its board. Counsel for the plaintiff conceded this but suggested that the independent directors were not added until some point after the complaint in this case was filed.

— Substantial Manufacturing assets—doubling BOO's consolidated volume for steel and aluminum products.

— *Robust and Scalable SAP IT Platform.*

— *Industry–Best Internet Platform powered by SAP—processed more than 75,000 web orders in FY05.*

— Sophisticated Inbound Call/Telephony Solution for Customer Care and Order Administration.

— Industry–Leading Youth Sports Division.

— Government Sales Division; Tripling current BOO market penetration.

— "Distributor" Sales division; Tripling current BOO market penetration.

— Industry leading presence in "Bid" markets; Substantial Elementary school presence.

— 17 Road Sales Professionals; 187 Total under BOO umbrella.[6]

Without specifying what Collegiate or Emerson had done wrong, the complaint portrays Collegiate's announcement as an expression of intent to execute a plan in which it would usurp the value of Sport Supply's assets for itself, without paying for them. In other words, the complaint alleges that Collegiate paid Emerson for a majority bloc of stock, but secured more than that. What it supposedly secured was the right to plunder Sport Supply's assets, not in a good faith effort to secure synergistic gains for both Collegiate and Sport Supply, but simply to divert the value of Sport Supply for Collegiate's exclusive benefit. The complaint contains no recitation of facts illustrating what vital organs of Sport Supply that Collegiate intended to extract for itself, or how Collegiate planned to perform the procedure.

The July Press Release also contained optimistic projections for Collegiate's performance for the rest of the year and 2006. According to the complaint, Collegiate knew or recklessly disregarded that these results were not achievable, because its costs for acquiring Emerson's stake in Sport Supply and other targets were running higher than it had originally estimated, and because Collegiate's outstanding notes were due to be treated as converted into common shares as of the end of September 2005. The higher costs and the need to treat the notes as converted allegedly foreshadowed lower per share earnings, which would, when recognized by the market, result in downward pressure on Collegiate's share price.

On September 8, 2005, Collegiate announced that it had entered into a merger agreement with Sport Supply. The agreement provided for Collegiate to acquire the remainder of the Sport Supply's shares at an exchange rate of 0.56 of a Collegiate share for each Sport Supply minority share. At the then-market price, this would have provided the minority with value equal to the $6.74 per share received by Emerson. But the merger agreement contained no collar.

On November 14, 2005, Collegiate announced that increased acquisition costs and the "as converted" treatment of its notes had reduced its earnings expectations. In the same announcement, Collegiate stated that " '[a] number of joint initiatives [with Sport Supply] have been put in place since July 1, 2005, and we look forward to fully realizing their economic benefits, which we expect to occur later in fiscal 2006 and more dramatically in fiscal 2007.' " [7] The market reacted negatively to the lowered estimates, and Collegiate's

---

6. Compl. ¶ 27 (emphasis added by the complaint).

7. Compl. ¶ 31 (quoting press release of Nov. 14, 2005).

shares dropped in price from $10.83 per share on November 11, 2005 to $9.25 per share on November 17, 2005.

The decline in Collegiate's stock price cratered the merger. A large institutional holder negotiated a sale of 1.66 million Sport Supply shares to Collegiate for $5.50 per share in cash. Then, on November 22, 2005, Collegiate announced that the merger agreement had been terminated because the deal was unlikely to close in a timely manner under the " 'previously contemplated terms....' " [8]

At the termination of the merger agreement, the story told by the complaint becomes even more conclusory and devoid of factual specificity, with the complaint simply stating:

> Despite the failure to close the merger, Collegiate continued apace to employ Sport Supply's assets to enhance Collegiate's business, all without proper payment to Sport Supply, or its shareholders. That Collegiate's actions have resulted in a diminution of the value of Sport Supply is shown by the fact that Collegiate was willing to pay $6.74 per share in cash for Sport Supply shares in July 2005; $6.74 worth of volatile stock in September 2005; and then $5.50 in cash in November 2005. Sport Supply shares last traded on December 12, 2005 at $4.85 per share, almost 30% lower than the price received by Emerson.[9]

## II. *The Counts In The Complaint*

The complaint attempts to state two viable counts. The first is pled as a direct, class claim against Emerson and Jurick.

It seeks recompense for the allegedly improper sale by Emerson of its control position in Sport Supply to Collegiate. Recognizing that Emerson had a presumptive right to sell its majority stake for a premium, the plaintiff pleads that Emerson (and Jurick, as its alleged controller and as Sport Supply's then Chairman and CEO) allegedly knew that Collegiate, upon acquiring control of Sport Supply, would "set out to transfer Sport Supply's valuable assets to the use and benefit of Collegiate's shareholders to the detriment of Sport Supply's shareholders." [10] Therefore, the complaint seeks an order "equitably redistribut[ing]" the premium Emerson received from Collegiate to Sport Supply's public shareholders.[11]

The second count is pled as a derivative claim on behalf of Sport Supply against Collegiate, and defendants Coerver and Rothenberg. That claim is closely related to the first count against Emerson and Jurick. Essentially, the second count contends that Collegiate was not entitled, by virtue of becoming Sport Supply's majority stockholder, to "the unfettered use and enjoyment of Sport Supply's assets and technologies without fair compensation, arrived at on terms that would be the same as if the parties bargained at arm's length and in good faith." [12] Supposedly Collegiate has "benefited handsomely from the use and transfer of Sport Supply's assets" but "has failed to pay Sport Supply (or its public shareholders) the fair price for these assets." [13] As directors of Sport Supply, Coerver and Rothenberg have "permitted, acquiesced in, and aided and abetted this misconduct," thereby "unjust-

---

8. *Id.* at ¶ 32 (quoting Nov. 22, 2005 announcement).

9. *Id.* at ¶ 33.

10. *Id.* ¶ 42.

11. *Id.* at ¶ 43.

12. *Id.* at ¶ 46.

13. Compl. at ¶ 47.

ly enrich[ing]" Collegiate.[14] By this course of action, Collegiate (as a dominating majority stockholder) and Coerver and Rothenberg (as a board majority) have breached their duty of loyalty by acting to benefit Collegiate at the expense of Sport Supply.

## III. *The Pending Motion To Dismiss Brought By Emerson And Jurick*

What gives rise to this opinion is the motion by defendants Emerson and Jurick to dismiss Count I of the complaint, which is the Count pled against them. Defendants Collegiate, Coerver, and Rothenberg have not moved to dismiss Count II. There are two major issues raised by defendants Emerson and Jurick in arguing for dismissal. First, they allege that the claims against them are derivative in nature and demand is not excused. Second, they contend that the complaint fails to state a claim upon which relief can be granted.

I examine those issues in turn.

## A. *Are The Claims Against Emerson And Jurick Derivative Claims, And If So, Is Demand Excused?*

Emerson and Jurick contend that although styled as a direct claim, Count I is in reality a derivative claim that belongs to Sport Supply. As such, they argue that Count I must be dismissed unless the complaint pleads facts supporting demand excusal. Their rationale for this position is simple: to the extent that Emerson is alleged to have received excess payments from Collegiate, not for its majority stock interest in Sport Supply, but as a payment for permitting Collegiate to usurp assets of Sport Supply itself, Sport Supply was injured as an entity because value belonging to it was transferred to Collegiate for no consideration. In other words, Emerson

argues that the plaintiff can only recover on Count I if it proves that Collegiate paid Emerson cash for use of Sport Supply's assets, instead of paying Sport Supply as an entity for that use. Thus, for the plaintiff to prevail on Count I, it must prove that Sport Supply as an entity was injured, a reality that exposes Count I as a derivative claim under the clarifying teaching of *Tooley v. Donaldson, Lufkin, & Jenrette.*[15]

■ This is a good argument of little utility here for an obvious reason. By its very nature, the success of Count I turns on proof that Collegiate exercised its newly purchased majority control over Sport Supply by using Sport Supply's assets in manner that was unfair to Sport Supply as an entity, thus diverting value that should have benefited all of Sport Supply's stockholders to the exclusive benefit of Collegiate. Although the relief sought in Count I—an equitable redistribution of the premium Collegiate paid to Emerson—would not adversely affect Collegiate, if granted in the exact form sought by the plaintiff, that prism on the question of demand excusal is misleadingly narrow. Viewed from a broader perspective, a decision by Coerver and Rothenberg to cause Sport Supply to sue Emerson would involve a concession that Collegiate somehow usurped the value of Sport Supply's assets in a manner that was inconsistent with the fiduciary duties Collegiate owed to Sport Supply as a majority stockholder exercising direct control of a non-wholly owned subsidiary. · As a result, even if Count I is a derivative count, demand is excused under the first prong of the *Aronson* test for demand excusal,[16] as Coerver and Rothenberg cannot objectively consider a demand that Sport Supply sue the employing entity

---

14. *Id.* at ¶ 47–48.

15. 845 A.2d 1031, 1033 (Del.2004).

16. *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).

to which they owe their livelihoods, Collegiate.

### B. Does The Complaint State A Claim Upon Which Relief Can Be Granted?

Because demand is excused, I now concentrate on Emerson's other major argument, which is that the complaint fails to plead facts that state a claim upon which relief can be granted. In examining a Rule 12(b)(6) motion, this court must accept the well-pled factual allegations in the complaint as true and draw reasonable inferences from them in the plaintiff's favor.[17] But "neither inferences nor conclusions of law or fact are accepted as true without specific allegations of fact which support the conclusion."[18] In support of their motion, Emerson accurately points out that in certain circumstances the court may consider the plain terms of documents incorporated in the complaint without thereby converting the motion into one for summary judgment.[19] Here, Emerson simply seeks, as is proper, to refer to the entire text of the July Press Release, a document the complaint quotes extensively, but selectively. If, after considering the plaintiff's complaint and the plain terms of the July Press Release, it appears reasonably certain to me that the facts pled in the complaint do not state a claim, then I must dismiss the complaint.[20]

The essence of Emerson's argument that the complaint fails to state a claim is simple: under Delaware law, Emerson was free, as a general matter, to sell its majority bloc in Sport Supply for a premium that was not shared with the other Sport Supply stockholders.[21] Emerson concedes that there are exceptions to the general rule. In particular, it concedes that there is precedent suggesting that a controlling stockholder who sells to a looter may be held liable for breach of fiduciary duty if the looter later injures the corporation and the former controller either (i) knew the buyer was a looter, or (ii) was aware of circumstances that would "alert a reasonably prudent person to a risk that his buyer [was] dishonest or in some material respect not truthful."[22] In the latter circumstance, that precedent suggests that "a duty devolves upon the seller to make such inquiry as a reasonably prudent person would make, and generally to exercise care so that others who will be affected by his actions should not be injured by [the] wrongful conduct."[23] Unlike the plaintiff, however, Emerson argues that, even if this precedent accurately recites the law, the complaint fails to state a claim.

---

17. *E.g., Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896 (Del.2002); *Solomon v. Pathe Commc'ns Corp.,* 672 A.2d 35, 38 (Del.1996).

18. *Haber v. Bell,* 465 A.2d 353, 357 (Del.Ch. 1983); *see also In re General Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 168 (Del.2006) (citing *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 65–66 (Del.1995)).

19. *E.g., In re General Motors,* 897 A.2d at 169; *In re Santa Fe,* 669 A.2d at 69; *In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 727 (Del. Ch.1999); *Sanders v. Devine,* 1997 WL 599539, at *4 (Del.Ch. Sept. 24, 1997).

20. *E.g., Lazard Debt Recovery GP, LLC v. Weinstock,* 864 A.2d 955, 964 (Del.Ch.2004);

*Orman v. Cullman,* 794 A.2d 5, 15 (Del.Ch. 2002).

21. For an excellent article accurately describing this area of Delaware corporation law, *see* Ronald J. Gilson & Jeffrey N. Gordon, *Controlling Controlling Shareholders,* 152 U. PA. L.REV. 785, 794 (2003) (citing *Harris v. Carter,* 582 A.2d 222, 234 (Del.Ch.1990) and *In re Sea–Land Corp. S'holders Litig.,* 1987 WL 11283, at *5 (Del.Ch. May 22, 1987)).

22. *Harris,* 582 A.2d at 235.

23. *Id.*

Before explaining why I agree with Emerson, I must add a prefatory caution. Although Emerson has not raised the issue, I am dubious that our common law of corporations should recognize a duty of care-based claim against a controlling stockholder for failing to (in a court's judgment) examine the bona fides of a buyer, at least when the corporate charter contains an exculpatory provision authorized by 8 *Del. C.* § 102(b)(7). After all, the premise for contending that the controlling stockholder owes fiduciary duties in its capacity as a stockholder is that the controller exerts its will over the enterprise in the manner of the board itself. When the board itself is exempt from liability for violations of the duty of care, by what logic does the judiciary extend liability to a controller exercising its ordinarily unfettered right to sell its shares? I need not answer that question here, but do note that the unthinking acceptance that a greater class of claims ought to be open against persons who are ordinarily not subject to claims for breach of fiduciary duty at all—stockholders—than against corporate directors is inadequate to justify recognizing care-based claims against sellers of control positions. Lest the point be misunderstood, drawing the line at care would do nothing to immunize a selling stockholder who sells to a known looter or predator, or otherwise proceeds with a sale conscious that the buyer's plans for the corporation are improper.[24] But it would impose upon the suing stockholders the duty to show that the controller acted with scienter and did not simply fail in the due diligence process.[25]

■ Here, however, I need not confront that more interesting question. By its own terms, the complaint simply fails to plead circumstances suggesting that Emerson knew, suspected, or should have suspected that Collegiate was either a looter or was dishonest and had improper plans for Sport Supply. It is, of course, true that the complaint is long on conclusory statements that Collegiate somehow misappropriated the assets of Sport Supply after acquiring control. By contrast with *Harris*, where the plaintiff pled specific facts creating an inference that the seller should have been suspicious of the buyer's honesty,[26] the plaintiff relies upon cutting and pasting press releases by Collegiate. Even as cut and paste, they do not create any inference that Emerson should have been suspicious that Collegiate would engage in improper behavior as Sport Supply's new controller. Rather, they are the typical statements of a strategic buyer who owns assets that can work together synergistically with the new target. Nothing in the quoted language suggests that Collegiate intended to usurp the assets of Sport

---

24. Remember, also, that the purchaser who becomes the new controller would, of course, be subject to liability for its own fiduciary misconduct.

25. Professors Gilson and Gordon express this limit on the right to sell at a premium nicely, and as existing when it is "apparent [to the controller] that the purchaser is likely to extract illegal levels of private benefits from operating the controlled corporation." Gilson & Gordon at 796. As I read their work, the term "apparent" means that the seller saw that the buyer was a likely looter and proceeded in the face of that knowledge.

26. *Harris,* 582 A.2d at 225 ("The existence of a purported investment by ISA in LICA was fictitious. It is alleged that the draft ISA financial statement was sufficiently suspicious to put any reasonably prudent business person on notice that further investigation should be made. Indeed Atlas' chief financial officer analyzed the financial statement and raised several questions concerning its accuracy, none of which were pursued by [the controlling shareholder group].").

Supply for its exclusive use, and no rational seller in Emerson's position would assume that was the unspoken intention of a strategic buyer that was itself a listed public company.

In support of that conclusion, it is appropriate to examine the full terms of the July Press Release that the complaint selectively quotes. It reads as follows:

> Collegiate Pacific, Inc (AMEX: BOO) today announced it has acquired a majority stake (53.2%) in Sport Supply Group, Inc ... "SSG" from Emerson Radio ... for $32 Million in cash.... [The] Chariman and CEO of Collegiate Pacific stated ... SSG is poised to become both an immediate and long-term contributor to Collegiate Pacific's consolidated sales and earnings growth. Combining BOO management's 500+ cumulative years of marketing, manufacturing and distribution expertise with SSG's team and operating assets should yield impressive results. Aligning SSG's technology and infrastructure with BOO management's rapid growth model and mindset is a compelling fit.... SSG both compliments and supplements BOO's existing market presence. SSG serves formerly untapped markets for BOO ... [and] supplements BOO in the varsity recreation and athletic equipment markets via their strong catalog and web presence, and formidable marketing and distribution assets. *Both Companies will continue to act as a powerful ally to their respective branded partners and distributors* as we expand our reach and continue to build BOO's

institutional sporting goods franchise.... This transaction places a multitude of valuable assets *under Collegiate Pacific's managerial umbrella.*[27]

Contrary to the plaintiff's assertions, nothing in that release should have put Emerson on notice that Collegiate had an improper plan to harm the minority stockholders of Sport Supply by draining off the company's assets for Collegiate's exclusive benefit. Rather, the press release simply suggested that Collegiate, like a typical strategic buyer, would attempt to capitalize on the synergistic benefits that could flow to both entities from an affiliation.[28]

Likewise, the complaint is devoid of anything but the most conclusory of allegations that defendant Jurick sold his corporate office or that Emerson received a payment for assets of Sport Supply, rather than just its stock. It is perfectly routine for a selling controller to cause its appointees to resign, permitting the new controller to use its newly-acquired voting power to control the board. After all, one buys control for a reason.

The complaint pleads no facts that suggest that Emerson received payments from Collegiate on notice that Collegiate was actually seeking to pay for the right to steal Sport Supply's assets. There are simply conclusory allegations that Emerson "knew" that Collegiate would "set out to use to transfer Sport Supply's valuable assets to the use and benefit of Collegiate's shareholders to the detriment of Sport

---

27. Emerson's Op. Br. at Ex. A (the July Press Release) (emphasis added).

28. As Gilson and Gordon point out, there is nothing intrinsically wrong with a parent and non-wholly owned subsidiary operating in a synergistic manner, because such synergies can benefit the subsidiary's minority stock-

holders. Gilson & Gordon at 795. If specific synergistic interactions are alleged to be unfair, our law, of course, permits those interactions to be challenged by an appropriately pled complaint. Id. The mere allegation that a parent and subsidiary were engaged in joint activity, without more, does not state a claim.

Supply's shareholders." [29] How Emerson would have known that is not made at all plain. The plaintiff does not plead facts suggesting that Emerson knew or should have suspected that it was being paid, not for the rights properly belonging to a controlling stockholder, but for the power to plunder Sport Supply.

In this regard, it is notable that the complaint's pleading regarding the post-sale conduct of Collegiate is vague, unspecific, and conclusory, and it does nothing to identify exactly what Collegiate supposedly has done with Sport Supply's assets that is improper. At most the complaint makes the conclusory allegation that "Collegiate continue[d] to cannibalize Sport Supply's assets" [30] while its merger proposal was alive. It supports that conclusion by reference to an excerpt from a November 14, 2005 press release by Collegiate referring to a "number of joint initiatives" that had been put in place between Collegiate and Sport Supply since Collegiate bought its control position. [31] The complaint contends the release was an "admission," but of what? Rationally read, the complaint merely suggests that Collegiate, as it had indicated when it announced its purchase of control, had a plan for Collegiate and Sport Supply to capitalize on the synergies between their assets. No fact in the complaint suggests how Collegiate's plans for doing that were unfair to Sport Supply. [32]

Of course, the complaint goes on at some length regarding the failure of Collegiate to consummate a merger with Sport Supply at a price identical to that paid to Emerson for its control position. But the failure of Collegiate to consummate a merger does nothing to buttress the plaintiff's effort to state a claim against Emerson. Indeed, the complaint pleads that even after Collegiate's merger proposal went away, the stock price of Sport Supply remained higher than it was before Emerson sold its position—some $4.85 per share—and that the operating results of the company have improved. Moreover, the reality that Collegiate pursued a merger option does not help the plaintiff create an inference that it had plans to steal Sport Supply's assets out the back door, much less one that Emerson should have known about or suspected existed. Whatever the plaintiff thinks of Collegiate's failed stock-for-stock merger proposal, that proposal hardly suggests that Collegiate meant to keep Sport Supply as a mere public shell, from which all the internal value would be extracted for Collegiate. Nor does the fact that Collegiate bought a large bloc of Sport Supply stock from a large institutional holder for $5.50 per share support such an inference.

No doubt the plaintiff would have enjoyed selling out at the price obtained by Emerson, but the plaintiff did not take the non-diversifiable risk necessary to secure a control premium. But the complaint, as pled, suggests that the plaintiff is better off now as a result of operating improvements at Sport Supply that have increased its profitability and stock price. Put simply, pure control premium envy is not a cognizable claim for a minority stockholder

---

29. Compl. ¶ 42.

30. *Id.* at ¶ 31.

31. *Id.*

32. At oral argument, counsel for the plaintiff could not make one specific factual allegation regarding Collegiate's misuse of Sport Sup-

ply's assets—not one. Rather, he seemed simply to believe it unlawfully unfair for Emerson to be able to sell control for a premium and for Collegiate to have its own stock price benefit as a result of owning a majority of Sport Supply. That belief is not embraced by our law.

under Delaware law.[33]

 The circumstances when a controller is subject to liability for selling its shares are not capacious and are exceptions to the general rule that controllers are free, as is any other stockholder, to alienate their shares, provided they comply with any transfer provisions in the relevant corporate instruments and in statutory law. The general rule's utility would be gutted by permitting a plaintiff to state a claim simply by alleging that a controller sold its control position to another solvent, public company in the same industry that announced its intention to capitalize on the synergies between itself and its new controlled subsidiary and that thereafter acted on those intentions in a manner that the plaintiff, in a wholly conclusory and unspecific manner, alleges were unfair to the subsidiary. To hold that such circumstances give rise to a claim opening the door to discovery puts a toll on that which our law says is a basic right of every stockholder, even those who own control: to sell. At the very least, a plaintiff seeking to state a claim must plead facts that indicate that the controller knew there was a risk that the buyer was a looter or otherwise intended to extract illegal rents from the subsidiary, at the expense of the subsidiary's remaining stockholders. The plaintiff here has not done that, and therefore even assuming that a controller can be held liable for mere carelessness in this context, the complaint against defendants Emerson and Jurick must be dismissed.

## IV. *Conclusion*

For the foregoing reasons, the complaint fails to state a claim upon which relief can be granted against defendants Emerson and Jurick. Therefore, the count in the complaint, Count I, directed against them is DISMISSED. IT IS SO ORDERED.

**33.** *See Hollinger Int'l, Inc. v. Black,* 844 A.2d 1022, 1087 (Del.Ch.2004) ("As a typical matter, the replacement of a subsidiary's controlling corporate stockholder through a transaction at the parent level should pose no cognizable threat to the subsidiary. The parent has a legitimate right to sell itself absent breaching some recognized duty to the subsidiary. There is utility to respecting this general freedom, which is a natural expectation of the owner of a controlling position and this freedom should be expected by the subsidiary's minority stockholders who have no common or statutory right to tag-along in a transfer of control at the parent level.") (citing Gilson & Gordon at 793–96), aff'd, 872 A.2d 559 (Del.2005); *see also Mendel v. Carroll,* 651 A.2d 297, 306–07 (Del.Ch. 1994) (opining that a board of directors would breach its fiduciary duties if it issued a dilutive option for the sole purpose of diluting an existing controlling stockholder and enabling the corporation to be sold in a transaction in which the controller's control premium was then shared with the other, former, minority stockholders; in other words, finding that corporate boards could not expropriate the controller's property (its control position and its premium-generating potential) solely for the purpose of redistributing the expropriated value to the minority).