# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FRANCIS M. FORD, on behalf of himself and all others similarly situated and derivatively on behalf of VMWARE, INC.,

Plaintiff,

v.

VMWARE, INC., JOSEPH M. TUCCI, MICHAEL W. BROWN, DONALD J. CARTY, JOHN R. EGAN, PAT GELSINGER, PAUL A. MARITZ, PAUL SAGAN, EMC CORPORATION, DENALI HOLDING INC., DELL INC. and UNIVERSAL ACQUISITION CO.,

Defendants.

)
)
)
)
)
)
)
)
) C.A. No. 11714-VCL
)
)
)
)
)
)
)
)
)
)
)

## MEMORANDUM OPINION

Date Submitted: February 3, 2017
Date Decided: May 2, 2017

Michael Hanrahan, Paul A. Fioravanti, Jr., Corinne Elise Amato, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Lee D. Rudy, Michael C. Wagner, Leah Heifetz, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania. *Attorneys for Plaintiff.*

Robert S. Saunders, Ronald N. Brown, III, Matthew P. Majarian, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware. *Attorneys for Defendants Joseph M. Tucci, Michael W. Brown, John R. Egan, Paul Sagan, Donald J. Carty, and EMC Corporation.*

Donald J. Wolfe, Jr., Matthew E. Fischer, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Jonathan C. Dickey, Paul J. Collins, GIBSON, DUNN & CRUTCHER LLP, Palo Alto, California; Marshall R. King, Jonathan D. Fortney, GIBSON, DUNN & CRUTCHER LLP, New York, New York. *Attorneys for Defendants Pat Gelsinger and Paul A. Maritz and Nominal Defendant VMware, Inc.*

Gregory P. Williams, Catherine G. Dearlove, John D. Hendershot, Susan M. Hannigan, RICHARDS, LAYTON & FINGER, P.A.; Wilmington, Delaware; John L. Latham, Brandon R. Williams, ALSTON & BIRD LLP, Atlanta, Georgia; Gidon M. Caine, ALSTON & BIRD LLP, East Palo Alto, California. *Attorneys for Defendants Denali Holding Inc., Dell Inc., and Universal Acquisition Co.*

**LASTER, V.C.**

In October 2015, EMC Corporation entered into a merger agreement with Denali Holding Inc. Nearly a year later, in September 2016, the transaction closed. Through the merger, Denali acquired all of EMC, including EMC's 81% equity interest in VMware, Inc. At the effective time, each publicly traded share of EMC common stock was converted into the right to receive $24.05 in cash plus 0.111 shares of Denali Class V common stock. The Class V shares were a new class of Denali equity, issued in connection with the merger, that tracked the performance of 65% of the value of the block of VMware shares that Denali acquired as a result of the merger.

A VMware minority stockholder brought this lawsuit, purporting to sue both derivatively on behalf of VMware and as a representative of a putative class of holders of VMware common stock. The complaint recounts a number of negative effects that the EMC-Denali merger had on VMware and the trading price of its common stock. The complaint seeks to turn these negative effects into claims for breach of fiduciary duty against (i) EMC, as VMware's pre-merger controlling stockholder, (ii) individuals affiliated with EMC who served as members of VMware's board of directors, and (iii) Denali, both for allegedly aiding and abetting breaches of duty by the other defendants and as the entity that became VMware's controlling stockholder. The complaint also names as defendants certain Denali affiliates.

The defendants have moved to dismiss the complaint pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. This decision grants the defendants' motion.

1

## I. FACTUAL BACKGROUND

The facts are drawn from the Second Amended and Supplemented Verified Class Action and Derivative Complaint (the "Complaint") and the documents it incorporates by reference. Additional facts are either undisputed or subject to judicial notice.

### A. The Parties

Nominal defendant VMware is a Delaware corporation headquartered in Palo Alto, California. It provides "virtualization infrastructure solutions utilized by organizations in building, delivering and consuming information technology resources." Compl. ¶ 5. In layman's terms, it uses software to reproduce systems that historically required separate hardware.

Defendant EMC is a Massachusetts corporation headquartered in Hopkinton, Massachusetts. Before the merger, its shares traded on the New York Stock Exchange. EMC owned a portfolio of technology businesses, including a controlling stake in VMware.

Defendant Denali is a Delaware corporation owned by affiliates of Michael Dell, the founder of Dell Inc., and Silver Lake Partners, a private equity firm. In 2013, Mr. Dell took Dell private in a management buyout sponsored by Silver Lake. *See In re Appraisal of Dell Inc.*, 2016 WL 3186538 (Del. Ch. May 31, 2016). Denali is the holding company that Mr. Dell and Silver Lake used to facilitate the transaction and through which they continued to own Dell after the transaction.

Denali acquired EMC pursuant to a merger agreement dated October 11, 2015 (the "Merger Agreement"). Dell and Universal Acquisition Co., a Denali-owed acquisition

vehicle, were also parties to the Merger Agreement. The Complaint named Dell and Universal as additional defendants. For simplicity, this decision generally refers only to Denali, even where Denali technically acted through Dell or Universal.

**B.      VMware's Dual-Class Charter**

In 2004, EMC acquired VMware for $635 million. In 2007, while preparing for an initial public offering of VMware equity, EMC caused VMware to adopt an amended and restated certificate of incorporation (the "Dual-Class Charter").

The Dual-Class Charter authorized two classes of VMware common stock. Class A shares carried one vote per share. Class B shares carried ten votes per share. The Class B shares also carried other special voting rights, such as the exclusive right to elect 80% of the members of VMware's board of directors (the "VMware Board"), whom the Dual-Class Charter referred to as the "Group I Members." The Class B shares had the right to vote together with the Class A shares to elect the remaining 20% of the VMware Board, whom the Dual-Class Charter referred to as the "Group II Members."

The Class B shares also carried special charter-based veto rights. Article VI of the Dual-Class Charter, titled "CONSENT OF HOLDERS OF CLASS B COMMON STOCK," provided as follows:

> In addition to any other vote required by law or by this Certificate of Incorporation, prior to the Operative Date, the prior affirmative vote of the holders of a majority of the outstanding shares of the Class B Common Stock, voting separately as a class, shall be required to authorize the Corporation to (and (in the case of clauses (iii) through (v) below) authorize or permit any Subsidiary (as defined in Article XI) to):
>
> (i)      adopt or implement any stockholder rights plan or similar takeover defense measure;

3

(ii)    consolidate or merge with or into any Person;

(iii)   permit any Subsidiary to consolidate or merge with or into any Person (other than (a) a consolidation or merger of a Wholly-Owned Subsidiary with or into the Corporation or with or into another Wholly-Owned Subsidiary or (b) in connection with a Permitted Acquisition);

(iv)    directly or indirectly acquire Stock, Stock Equivalents or assets (including, without limitation, any business or operating unit) of any Person (other than the Corporation or its Subsidiaries), in each case in a single transaction or series of related transactions, involving consideration . . . paid or delivered by the Corporation and its Subsidiaries in excess of $100,000,000; provided, however, this clause (iv) of this Section A shall not require the vote of the holders of Class B Common Stock in connection with acquisitions of securities pursuant to portfolio investment decisions in the ordinary course of business or transactions to which the Corporation and one or more Wholly-Owned Subsidiaries are the only parties;

(v)     issue any Stock or any Stock Equivalents, except (a) the issuance of shares of Stock of a Wholly-Owned Subsidiary of the Corporation to the Corporation or another Wholly-Owned Subsidiary of the Corporation, (b) pursuant to the Initial Public Offering, or (c) the issuance of shares of Class A Common Stock or options or other rights to purchase Class A Common Stock pursuant to employee benefit plans or dividend reinvestment plans approved by the Board of Directors (provided, however, that notwithstanding the provision of this clause (c), the prior affirmative vote of the holders of a majority of the outstanding shares of the Class B Common Stock, voting separately as a class, shall be required to authorize the Corporation to finally determine the aggregate size of its annual equity grants);

(vi)    dissolve, liquidate or wind up the Corporation;

(vii)   declare dividends on any class or series of the capital stock of the Corporation;

(viii)  enter into any arrangement or agreement with any Person which the Board of Directors determines to be on terms exclusionary to EMC or that are exclusive to such Person, where such Person is offering or proposes to offer products or services that are substantially equivalent to products and services offered by EMC; and

(ix)    alter, amend, terminate or repeal, or adopt any provision inconsistent with, in each case whether directly or indirectly, or my merger, consolidation

or otherwise, Articles V or VI or Sections A, C through G or J of Article VII of the Amended and Restated Certificate of Incorporation or Sections 2.2, 2.8(D), 2.11, 3.2(A), 3.2(C), 3.9 or 3.11 of the Amended and Restated Bylaws of VMware.

This decision refers to these provisions as the "Class B Consent Rights." For purposes of this case, the existence of the Class B Consent Rights meant that without EMC's prior approval, the VMware Board could not take meaningful defensive action against EMC, such as by adopting a stockholder rights plan or issuing stock that would materially dilute EMC's controlling position.

After adopting the Dual-Class Charter, VMware conducted an initial public offering of shares representing 65% of its Class A stock. The newly issued Class A shares were listed on the New York Stock Exchange. EMC retained the remaining 35% of the Class A stock and all of the Class B stock. EMC's combined holdings equated to 81.1% of VMware's total outstanding common stock and 97.4% of its aggregate voting power.

Through its dominant voting position, EMC controlled VMWare and the composition of the VMware Board. Through its ownership of all of the Class B shares, EMC controlled the election of the Group I Members. Through its combined ownership of 35% of the Class A shares and all of the Class B shares, EMC controlled the election of the Group II Members.

In practice, EMC caused the VMware Board to consist of seven individuals affiliated with EMC and two independent, outside directors. During the time period covered by the Complaint, five members of the VMware Board also served as members of EMC's board of directors (the "EMC Board"):

5

- Defendant Joseph M. Tucci joined the VMware Board in 2007. He served as Chairman of the VMware Board and as a member of its Mergers and Acquisitions Committee. He also served as the CEO of EMC and as Chairman of the EMC Board.

- Defendant Michael W. Brown joined the VMware Board in 2007. He chaired its Audit Committee and served as a member of its Compensation and Corporate Governance Committee. He also served as a member of the EMC Board.

- Defendant John R. Egan joined the VMware Board in 2007. He chaired its Mergers and Acquisitions Committee. He also served as a member of the EMC Board.

- Defendant Paul Sagan joined the VMware Board in 2014. He served on its Audit Committee and Compensation Committee. He also served as a member of the EMC Board.

- Defendant Donald J. Carty joined the VMware Board on December 13, 2015. He served on its Audit Committee. He began serving as a member of the EMC Board in January 2015.

Two other members of the VMware Board were officers of EMC subsidiaries. Defendant Pat Gelsinger was both a director of VMware and its CEO. Before joining VMware in 2012, he served as President and Chief Operating Officer of a division of EMC. Defendant Paul Maritz was both a director of VMware and CEO of Pivotal Software, Inc., another majority-owned subsidiary of EMC. From September 2012 until March 2013, he served as Chief Strategist at EMC. Before that, he served as CEO of VMware.

Non-parties Pamela Craig and Dennis D. Powell were the two independent members of the VMware Board. Both resigned in December 2015, after the Merger Agreement was executed but before the transaction closed.

The Complaint names as defendants the members of the VMware Board who were also directors of EMC or who were officers of EMC subsidiaries and hence beholden to

6

EMC for their positions. For simplicity, this decision refers to these defendants as the "Dual Directors."

## C. Approaches From Third Parties

In July 2014, two activist funds sponsored by Elliot Associates, L.P. accumulated a 2.2% stake in EMC, representing an investment of more than $1 billion. Elliot approached the EMC Board and suggested that EMC spin off VMware.

EMC entered into a confidentiality and standstill agreement with Elliot. Discussions about a spinoff began, then stalled. On October 8, 2014, Elliot sent an open letter to the EMC Board that argued for a spinoff. After receiving the letter, the EMC Board resumed discussions with Elliot.

Meanwhile, in September 2014, Denali approached the EMC Board about a potential business combination. EMC entered into a confidentiality agreement with Denali and began discussing a possible deal.

## D. Further Discussions With Denali

In February 2015, the EMC Board chose to focus on a deal with Denali. Discussions between EMC and Denali continued, and in April 2015, Denali proposed to buy all of EMC's businesses other than VMware for cash. Denali expressed "strong interest" in acquiring a "meaningful" portion of EMC's stake in VMware. Compl. ¶ 30.

The EMC Board believed that control over VMware was central to Denali's strategic rationale for acquiring EMC. The EMC Board also believed that Denali could not afford to buy all of EMC for cash, including the VMware stake, without incurring an unsustainable level of debt. For a deal to happen, this problem needed to be solved.

In the past, the EMC Board and management had considered issuing a tracking stock tied to the performance of its stake in VMware, but they had shelved the idea. After receiving Denali's indication of interest, the EMC Board and its advisors evaluated several alternatives to a transaction with Denali, including the potential issuance of a tracking stock. In summer of 2015, the EMC Board, EMC management, and their advisors gave further consideration to a tracking stock while at the same time evaluating the terms of a potential deal with Denali.

According to the Complaint, at some point the idea of a tracking stock became part of the discussions with Denali:

> Incorporation of a tracking stock component in EMC's deal with Denali was inevitable. Either due to a suggestion by EMC, or at the insistence of EMC, on July 15, 2015, the EMC Board received a revised non-binding indication of interest from Denali that included **_the issuance of non-voting tracking stock_** intended to track 60% of EMC's economic interest in VMware.

Compl. ¶ 34. It does not necessarily follow that just because EMC was considering a tracking stock, EMC must have proposed the idea of incorporating a tracking stock into the Denali deal. Issuing a tracking stock is one tool that creative financial engineers deploy to unlock value. But it is reasonably conceivable that EMC was the source, so this decision draws that plaintiff-friendly inference.

In September 2015, Denali submitted two further proposals to EMC. A proposal dated September 1 increased the economic interest represented by the tracking stock from 60% of the VMware stock to 70%, but the tracking stock would not have any voting rights. A proposal dated September 23 kept the economic interest represented by the tracking stock at 60%, but the tracking stock would have voting rights. Notably, the voting rights

8

concerned matters submitted to stockholders of Denali, not VMware. They also comprised a small minority of Denali's outstanding voting power.

The tracking stock solved Denali's financing problem because it enabled Denali to pay EMC's stockholders less cash and therefore take on less debt. The tracking stock also could reduce the capital gains taxes that EMC's stockholders would owe because the transaction would operate (at least in part) as a stock-for-stock exchange.

In each of its proposals, Denali valued the tracking stock using the then-current market price of VMware's publicly traded Class A stock. That was logical, since Denali was the potential buyer and wanted to value its acquisition currency as highly as possible. The EMC Board, by contrast, received advice from its financial advisors that the tracking stock would likely trade at a discount to the Class A stock. Evercore LLC explained to the EMC Board that tracking stocks often trade at discounts to the estimated value of the underlying assets. Evercore advised that because of the complexity of the tracking stock and the significant amount of debt that Denali would take on, it was likely that the tracking stock would trade at a discount of up to 10% relative to the Class A stock. Morgan Stanley advised that the tracking stock could trade anywhere from a discount of 5% to a premium of 5% over the Class A stock.

Because of the overlapping membership between the EMC Board and the VMware Board, a majority of the members of the VMware Board knew about the potential merger, the anticipated Denali tracking stock, and the expectation that it could trade at a discount to the price of VMware's Class A stock. The plaintiff posits that as directors of VMware, the Dual Directors had a duty to use this knowledge to defend VMware and its minority

9

stockholders against the threat of harm from Denali's acquisition of EMC and the issuance of the tracking stock. The Complaint alleges that the Dual Directors failed to act because they were beholden to EMC.

In support of its theory of disloyal inaction, the Complaint asserts that EMC and the Dual Directors made sure that the four VMware directors who were not also members of the EMC Board—Gelsinger, Maritz, Craig, and Powell—did not learn about the merger until late in the process. The Complaint alleges that on October 6-7, 2015, Tucci, EMC management, and representatives of Morgan Stanley met with Craig, Powell, and certain VMware executives to discuss the merger. At that point, the deal terms were largely set and only four days away from final approval. The plaintiff draws the inference that EMC and the Dual Directors must have known that loyal VMware fiduciaries would have opposed the merger and the issuance of the tracking stock, so they kept the non-conflicted VMware fiduciaries in the dark until it was too late for them to do anything.

E.     The Merger Agreement

On October 11, 2015, the EMC Board approved the Merger Agreement. It called for Universal to merge with and into EMC, with EMC emerging as a wholly owned subsidiary of Denali (the "Merger"). Each share of EMC common stock would be converted into the right to receive $24.05 in cash plus 0.111 shares of Denali Class V common stock. The Class V stock would track the value of 65% of Denali's 81% interest in VMware, equivalent to about 53% of the equity of VMware.

The parties to the Merger Agreement valued Denali's Class V stock at $81.78 per share. The Merger Agreement therefore implicitly valued EMC's common stock at $33.15

10

per share ($24.05 + ($81.78 x 0.111)). The transaction implicitly valued EMC's equity at $67 billion and VMware's equity at $33 billion. Morgan Stanley and Evercore opined that the merger consideration as a whole was fair to EMC's common stockholders from a financial point of view.

To finance the Merger, Denali secured $49.5 billion in debt financing. Denali provided $4.25 billion in equity financing. Without the Class V stock, Denali would have needed another $18 billion to finance the deal.

In the Merger Agreement, EMC agreed not to take various actions it had the ability to take as a controlling stockholder under the Delaware General Corporation Law (the "DGCL"), such as amending VMware's bylaws. EMC also agreed not to consent to VMware taking any of the actions governed by the Class B Consent Rights, such as adopting a rights plan or issuing additional shares.

These and other provisions in the Merger Agreement only bound EMC. VMware was not a party to the Merger Agreement. The transaction did not require any action by the VMware Board or VMware's stockholders.

## F. Reactions To The Merger

Elliott reacted positively to the Merger. In September 2015, Elliot increased its holdings in EMC. On October 12, 2015, after the announcement of the Merger, Elliott released a statement noting that it was "pleased to participate in VMware's ongoing upside through the tracking stock." Compl. ¶ 43.

11

VMware's stock, by contrast, traded down. Just before the announcement of the transaction, VMware's Class A stock traded at $78.65 per share. By October 19, 2015, the price had slipped to $69.22.

The Complaint primarily complains about the decline in the market price of VMware's Class A stock. The Complaint asserts that the market price of the Class A shares declined because (i) restrictions in the Merger Agreement constrained VMware, (ii) the Merger itself would harm VMware, and (iii) the supply of Denali Class V shares would depress the market price of the VMware Class A shares. On this last point, the Complaint alleges that "the 79 million share float in VMware's Class A will be drowned out by the 223 million shares of [Denali Class V] Tracking Stock." Compl. ¶ 46.

## G.     The Virtustream Joint Venture

On October 20, 2015, just a week after the announcement of the Merger, EMC disclosed that it was forming a new joint venture with VMware called "Virtustream Cloud Services." VMware and EMC each would own half of the equity in the joint venture. By the end of the next trading day, the price of the VMware Class A stock had dropped from $68.76 to $55.42 per share.

According to the Complaint, the steep decline in VMware's stock price reflected fears that the Merger in general and the Virtustream joint venture in particular would hinder VMware's growth. Analysts posited that VMware's participation in Virtustream would reduce its non-GAAP earnings from $500 million to $300 million in 2016. Three analysts downgraded their ratings and price targets for VMware, citing reduced revenues, reduced growth, and increased costs associated with VMware's involvement in Virtustream.

12

In a Form 10-Q dated November 9, 2015, VMware acknowledged that the announcement of the Merger was having an adverse impact on its stock price. VMware also recognized that the anticipated issuance of Denali's Class V shares could further depress the price of VMware's Class A shares:

> The tracking stock to be issued by Denali, while not a VMware issued security, would increase the supply of publicly traded securities that track VMware's economic performance and could create the perception that the tracking stock dilutes the holdings of our public stockholders, both of which could put downward pressure on our stock price.

Compl. ¶ 90.

On December 13, 2015, VMware held its annual meeting of stockholders. In advance of the meeting, the two independent members of the VMware Board—Craig and Powell—resigned. On December 14, 2015, VMware announced that it would no longer participate in the proposed Virtustream joint venture.

## H.    EMC And Dell Press Ahead With Their Plans To Merge.

In December 2015, EMC and Denali filed their joint Form S-4 Registration Statement and Preliminary Proxy Statement in support of the Merger. In the Form S-4, Denali stated that it would "consider opportunities to repurchase [the Class V shares] from time to time," but could not guarantee that any shares would be repurchased. Compl. ¶ 96. Denali also stated that it hoped to reduce its indebtedness after the completion of the Merger, but might not be able to do so quickly. VMware's stock price fell another 3%.

In January and February 2016, VMware's President resigned. So did its Chief Financial Officer. So did the head of Networking and Security.

13

Also in January 2016, VMware held an earnings call during which it announced positive fourth quarter results but provided negative guidance going forward. According to VMware management, total revenues were only projected to grow between 2% and 4%, even though cash flow from operations was projected to increase by 18% and free cash flow by 26.5%. VMware management also announced that it would lay off 800 employees in connection with a proposed restructuring. The price of VMware's Class A shares dipped further. EMC held its earnings call the next day. EMC stressed that it intended to consummate the deal with Denali on the terms set forth in the Merger Agreement.

On February 9, 2016, the trading price of VMware's Class A stock hit a low of $43.84 per share. On February 12, Denali asked the New York Stock Exchange to list the Class V shares under the symbol "DVMT."

On September 7, 2016, the Merger closed. EMC became a wholly owned Denali subsidiary, Denali issued a total of 222,966,450 shares of Class V stock, and the Class V stock began to trade.

## I. This Litigation

Plaintiff Francis M. Ford initially filed suit in November 2015, one month after the announcement of the Merger. He did not seek to enjoin the Merger. He filed a motion seeking a preliminary injunction to block the issuance of the Class V shares, but he did not pursue it.

In June 2016, Ford filed the currently operative Complaint. At that point, the Merger still had not closed. The Complaint continued to seek an injunction against the issuance of

14

the Denali Class V shares, but Ford did not press forward with an application. The defendants moved to dismiss the Complaint, and the parties briefed the motion.

At present, the Merger has closed, and the Class V stock is trading. The allegations of the Complaint, however, still depict a transaction that has not yet closed. This divergence gives the Complaint a counterfactual quality. It would have been helpful if the Complaint reflected the current transactional reality, but permitting an amendment at this point, after briefing and argument on a motion to dismiss, would impose unnecessary expense on the parties.

## II.     LEGAL ANALYSIS

The defendants have moved to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. When considering such a motion,

> (i) all well-pleaded allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations and internal quotation marks omitted). "[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

The Complaint contains many factual allegations about ways in which the Merger Agreement and Merger ostensibly harmed VMware and holders of the publicly traded Class A stock. The Complaint does not link these diverse allegations to particular legal

15

theories. It simply incorporates the factual allegations by reference into four cursory

counts:

- Count I contends that the Dual Directors and EMC breached their fiduciary duty of loyalty by pursuing EMC's interests rather than VMware's interests. Count I asserts this claim directly on behalf of a purported class of VMware common stockholders.

- Count II asserts the same claim as Count I derivatively on behalf of VMware.

- Count III asserts that Denali breached its fiduciary duty as a controlling stockholder or, in the alternative, aided and abetted breaches of fiduciary duty by the other defendants. Count III asserts this claim both directly on behalf of a purported class of VMware common stockholders and derivatively on behalf of VMware.[1]

- Count IV asserts a claim for aiding and abetting breaches of fiduciary duty against Dell and Universal. Count IV asserts this claim both directly on behalf of a purported class of VMware common stockholders and derivatively on behalf of VMware.[2]

Because of this structure, it is difficult to analyze the Complaint by count. This decision

therefore takes in turn the categories of factual objections that the Complaint advances and

analyzes in each case whether the objections give rise to a claim against any of the

defendants.

---

[1] It is not clear to me why the drafters of the Complaint felt the need to frame their principal claim for breach of fiduciary duty in two counts, first directly in Count I and then derivatively in Count II, when they were content to frame their secondary claims in single counts that incorporated both direct and derivative characterizations. I would think that both theories would warrant the same approach, *i.e.*, either use separate counts for the derivative and direct versions in both instances or combine them in both instances. The plaintiff's answering brief did not shed any light on this oddity.

[2] It is not clear to me why the Complaint includes an aiding and abetting claim against Denali in Count III, but then asserts a separate aiding and abetting claim against Denali's affiliates in Count IV. The Complaint does not distinguish meaningfully among Denali, Dell, or Universal. The plaintiff's answering brief did not distinguish among them either.

The parties have skirmished about whether the plaintiff's claims are properly styled as derivative or direct. This decision holds that the core theories fail to state a claim on which relief can be granted. This determination makes it unnecessary to determine which form of representative action provides the appropriate vehicle for a minority stockholder's litigation efforts.

## A.    The Failure-To-Spin Theory

The plaintiff's first objection is that EMC declined to spin off VMware when approached by Elliott. According to the plaintiff,

> EMC was not interested in unlocking the standalone value of VMWare. Instead, EMC planned to sell itself to [Denali] along with its controlling interest in VMware. This plan was partially driven by Tucci's need for a succession plan to facilitate and pay for his upcoming retirement.

Dkt. 57 ("PAB"), at 9 (citing Compl. ¶¶ 7, 28); *see id.* at 13 ("EMC nixed Elliott's spin off proposal at the outset of its negotiations with [Denali] because VMware was more valuable to EMC as a bargaining chip with [Denali]."). Framed as a claim, the theory appears to be that EMC and the Dual Directors breached their duty of loyalty by failing to pursue an alternative that EMC disfavored but which would have offered greater benefits to VMware and its minority stockholders. This objection does not state claim on which relief can be granted.

Spinning off VMware would have required EMC to alienate its shares. "A majority shareholder has discretion as to when to sell his stock and to whom, a discretion that comes from the majority shareholder's rights *qua* shareholder." *Peter Schoenfeld Asset Mgmt. LLC v. Shaw*, 2003 WL 21649926, at *2 (Del. Ch. July 10, 2003) (citation and internal

17

quotation marks omitted). There is a "long-standing rule that a controller does not have to entertain offers" to sell its shares or a company it controls. *Buttonwood Tree Value Pr's, LP v. Sullivan*, 126 A.3d 643, 2015 WL 6437218, at *1 (Del. Oct. 22, 2015) (ORDER). "[A] mere refusal of a controller to allow the entity to be sold does not support a cause of action against it or its affiliated directors." *Id.*

EMC was under no obligation to alienate its shares by spinning off VMware for the benefit of VMware and its minority stockholders. EMC could act in its own interest when determining to retain its property. This objection does not give rise to a viable claim.

## B. The Known-Looter Theory

The plaintiff's second objection appears to be that EMC sold itself to Denali, taking control of VMware with it, and that Denali can now control VMware. Framed as a legal claim, the theory appears to be that (i) EMC breached its fiduciary duties by selling itself to a known looter, and (ii) the Dual Directors breached their fiduciary duties by failing to defend VMware against the sale. Neither theory survives analysis under Rule 12(b)(6)..

### 1. The Known-Looter Theory Applied To EMC

The sale-to-a-known-looter theory fails as applied to EMC. "[T]he general rule [is] that controllers are free, as is any other stockholder, to alienate their shares, provided they comply with any transfer provisions in the relevant corporate instruments and in statutory law." *Abraham v. Emerson Radio Corp.*, 901 A.2d 751, 762 (Del. Ch. 2006) (Strine, V.C.). A controller has the same freedom of action if it chooses a different transactional mechanism for conveying the stockholder-level sale. *See Hollinger Int'l v. Black* (*Hollinger I*), 844 A.2d 1022, 1087 (Del. Ch. 2004) (Strine, V.C.) (explaining that the law

18

governing the sale of a control block "does not turn on whether the ultimate controlling stockholder is selling its [shares] directly or is selling the intermediate holding company through which it exercises control."), *aff'd*, 872 A.2d 559 (Del. 2005). When a controller sells itself by engaging in a merger, it transfers its controlling block to the post-transaction entity by operation of law. *See* 8 *Del. C.* § 259. That stockholder-level transfer of property rights is subject to the same rules that govern a controller's direct sale of its control block. *Cf. Star Cellular Tel. Co. v. Baton Rouge CGSA, Inc.*, 647 A.2d 382 (Del. 1994) (TABLE) (affirming the applicability of a limited partnership agreement's transfer restrictions when a general partner merged with a third party and characterizing the resulting analysis as "one of basic contract construction").

Although a controlling stockholder does not owe traditional fiduciary duties when selling its shares, it cannot act with impunity. "[N]o universal privilege arising from the corporate form . . . exempts a controlling shareholder who sells corporate control from the wholesome reach of th[e] common-law duty [of care]." *Harris v. Carter*, 582 A.2d 222, 235 (Del. Ch. 1990) (Allen, C.).

> [W]hile a person who transfers corporate control to another is surely not a surety for his buyer, when the circumstances would alert a reasonably prudent person to a risk that his buyer is dishonest or in some material respect not truthful, a duty devolves upon the seller to make such inquiry as a reasonably prudent person would make, and generally to exercise care so that others who will be affected by his actions should not be injured by wrongful conduct.

*Id*. A controller who sells to a "known looter" can face liability for the resulting harm. *Hollinger I*, 844 A.2d at 1087.

To state a claim under the "known looter" doctrine, a complaint must allege facts supporting a reasonable inference that the seller (i) knew the buyer was a looter or (ii) was aware of circumstances that would "alert a reasonably prudent person to a risk that his buyer [was] dishonest or in some material respect not truthful." *Harris*, 582 A.2d at 235; *accord Abraham*, 901 A.2d at 758. The complaint also must allege that the buyer subsequently looted the corporation, thereby inflicting injury. *Abraham*, 901 A.2d at 758. If the feared or threatened looting never occurred, then there is no harm to remedy and no ripe claim to address.

The Complaint alleges in conclusory fashion that EMC "kn[e]w that [Denali] intend[ed] to loot VMware by draining out its cash and forcing unfair business relationships upon it." Compl. ¶ 86. The Complaint does not support this allegation with any underlying facts. The absence of supporting allegations contrasts with the complaint in *Harris*, where the plaintiff alleged that during the course of negotiating with the buyer, the sellers received suspicious financial statements, dubious representations, and even a warning from the controlled company's chief financial officer that the buyer's financial statements appeared fraudulent. 582 A.2d at 225–26. In *Harris*, these detailed allegations were sufficient to support a claim. In this case, the Complaint's conclusory allegations are insufficient. *See Lord v. Souder*, 748 A.2d 393, 398 (Del. 2000).

Equally important, the Complaint's allegations do not support a reasonable inference that Denali has looted VMware. The concept of looting would involve Denali taking VMware's assets on unfair terms and using them to benefit Denali or one of its subsidiaries other than VMware. A prime example would be taking VMware's cash

20

through a non-ratable transfer and using the proceeds to pay down Denali's debt, or causing VMware to assume an obligation on behalf of Denali or one of its subsidiaries. The Complaint does not allege anything of the sort. The Complaint pleads at most that Denali plans at some point to use VMware's $8.2 billion in cash to repay Denali's debt. This is a conclusory and speculative allegation of future harm that the court need not credit.

At most, the Complaint's allegations support an inference that owning VMware was central to Denali's decision to acquire EMC and that Denali intended to integrate VMware with its other businesses so that they would operate synergistically. "That mundane prospect provides no rational basis for a seller to conclude that the buyer intends to embark on a course of illegal usurpation of the subsidiary's assets for its own unfair benefit." *Abraham*, 901 A.2d at 753. The Complaint's known-looter theory does not give rise to a claim against EMC.

### 2. The Known Looter Theory Applied To The Dual Directors

The known-looter theory also fails as applied to the Dual Directors. The gist of this version of the theory is that the Dual Directors (i) knew that EMC was selling to a looter, (ii) had a duty to defend VMware and its minority stockholders, and (iii) disloyally failed to take action to defend VMware and its minority stockholders out of loyalty to EMC.

In the abstract, a plaintiff might be able to state a claim against a board of directors for failing to defend against self-interested action by a controller. The Delaware Supreme Court has held that "in the broad context of corporate governance, including issues of fundamental corporate change, a board of directors is not a passive instrumentality." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985). The board has a

21

"fundamental duty and obligation to protect the corporate enterprise, which includes stockholders, from harm reasonably perceived, irrespective of its source." *Id.* "Representation of the financial interests of others imposes on a director an affirmative duty to protect those interests . . . ."[3]

Delaware decisions recognize that a board can respond to a threat posed by a controlling stockholder:

> The reality is that controlling stockholders have no inalienable right to usurp the authority of boards of directors that they elect. That the majority of a company's voting power is concentrated in one stockholder does not mean that that stockholder must be given a veto over board decisions when such a veto would not also be afforded to dispersed stockholders who collectively own a majority of the votes. Like other stockholders, a controlling stockholder must live with the informed (i.e., sufficiently careful) and good faith (i.e., loyal) business decisions of the directors unless the DGCL requires a vote. That is a central premise of our law, which vests most managerial power over the corporation in the board, and not in the stockholders.

---

[3] *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985). This opinion omits *Van Gorkom*'s subsequent history, which is convoluted and potentially misleading. Strict rules of citation call for identifying *Van Gorkom* as having been overruled in part by *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009). That case responded to *Van Gorkom*'s loose use of the term "ratification" to refer to the effect of an organic stockholder vote contemplated by the DGCL. The Delaware Supreme Court limited the use of the term "ratification" to its "classic" sense, namely situations where one decision-maker has made a decision unilaterally. 965 A.2d at 713. The decision overruled *Van Gorkom* to the extent the earlier case used the term "ratification" to refer to an organic vote called for by the DGCL. *See id.* at 713 n.54. Other than on this narrow point of terminology, *Gantler* did not overrule *Van Gorkom*. Unfortunately, *Gantler*'s attempt to correct the terminology used in *Van Gorkom* created the misimpression that the case had worked a broader change in Delaware law. The Delaware Supreme Court held subsequently that *Gantler* did not have this broader consequence. *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 311 (Del. 2015). In my view, it muddies the waters to cite *Gantler* as having overruled *Van Gorkom* in part, both because *Gantler* only sought to clarify a point of terminology and because *Corwin* subsequently made clear that *Gantler* did not "unsettle a long-standing body of case law." *Id.*

*Hollinger Inc. v. Hollinger Int'l, Inc.* (*Hollinger II*), 858 A.2d 342, 387 (Del. Ch. 2004) (Strine, V.C.), *appeal refused*, 871 A.2d 1128 (Del. 2004) (TABLE).

> Equity will protect a controlling stockholder against the dilution of its position when a board acts for an improper purpose, such as entrenchment, that is adverse to the interests of the entity and all of its stockholders, but a board otherwise does not have a duty to protect the controller. The board's fiduciary duty of loyalty compels the directors to act in the best interests of the entity and the stockholders as a whole, and a board acting loyally may take action to oppose, constrain, or even dilute a large or controlling stockholder.

*Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at \*11 (Del. Ch. Nov. 7, 2013) (citations omitted). "Where . . . a board of directors acts in good faith and on the reasonable belief that a controlling shareholder is abusing its power and is exploiting or threatening to exploit the vulnerability of minority shareholders, . . . the board might permissibly take such an action." *Mendel v. Carroll*, 651 A.2d 297, 304 (Del. Ch. 1994) (Allen, C.). "[D]irector primacy remains the centerpiece of Delaware law, even when a controlling stockholder is present." *In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 415 (Del. Ch. 2010).

But before an obligation to defend can arise, there must be a threat of "harm reasonably perceived." *Unocal*, 493 A.2d at 954. The known-looter theory as applied to the Dual Directors falls short because the Merger did not present VMware with a legally cognizable threat.

> As a typical matter, the replacement of a subsidiary's controlling corporate stockholder with another through a transaction at the parent level should pose no cognizable threat to the subsidiary. The parent has a legitimate right to sell itself absent breaching some recognized duty to the subsidiary. There is utility to respecting this general freedom, which is a natural expectation of the owner of a controlling position and this freedom should be expected by

23

the subsidiary's minority stockholders who have no common or statutory right to tag-along in a transfer of control at the parent level.

*Hollinger I*, 844 A.2d at 1087. For a threat to exist, there must be something more than simply a parent-level sale, such as a situation where the "controlling shareholder . . . was in the process [of] or threatening to violate his fiduciary duties to the corporation." *Mendel*, 651 A.2d at 306. "The classic example is if the controlling stockholder is going to sell to a known looter." *Hollinger I*, 844 A.2d at 1087. When a complaint fails to support a reasonable inference that the controller was selling to a known looter, it likewise fails to support a reasonable inference that the subsidiary directors failed to defend against that threat.

The failure-to-defend theory also fails to state a claim against the Dual Directors because the Complaint does not identify anything that the VMware Board could have done to defend VMware against the Merger. It was defense counsel, not plaintiff's counsel, who identified during oral argument the two obvious actions that a subsidiary board might take to protect against the depredations of a controller: (i) adopting a stockholder rights plan[4] or

---

[4] *See CNX Gas*, 4 A.3d at 415 ("A subsidiary board, acting directly or through a special committee, can deploy a rights plan legitimately against a controller's tender offer, just as against a third-party tender offer, to provide the subsidiary with time to respond, negotiate, and develop alternatives."); *La. Mun. Police Empls.' Ret. Sys. v. Fertitta*, 2009 WL 2263406, at *8 & n.34 (Del. Ch. July 28, 2009) (declining to dismiss claim that board breached its fiduciary duties by failing to employ rights plan to block creeping acquisition by large and arguably controlling stockholder when considered "together with other suspect conduct"); *Hollinger I*, 844 A.2d at 1085–89 (finding that subsidiary board validly deployed rights plan against controlling stockholder); *see CNX Gas*, 4 A.3d at 413 ("[In 2009], the directors of iBasis adopted a rights plan in response to a tender offer by its controlling stockholder, Royal KPN."); *cf. In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 430, 432, 451 (Del. Ch. 2002) (Strine, V.C.) (reviewing controlling stockholder tender offer where special committee of subsidiary requested that board resolution creating

24

(ii) issuing a dilutive stock option or block of equity.[5] Because of the Class B Consent Rights, VMware needed EMC's consent before it could do either. The Dual Directors cannot be held responsible for failing to take action that they could not take.[6]

The most the plaintiff argues is that the VMware Board should have advocated against the Merger. The Complaint's allegations do not support a reasonable inference that advocacy would have caused EMC or Denali to change course regarding the Merger, the

---

committee clarify that committee had power to adopt rights plan to defend against offer; noting that to have full power of board, special committee would need power to deploy rights plan).

[5] *See Mendel*, 651 A.2d at 306 ("I continue to hold open the possibility that a situation might arise in which a board could, consistently with its fiduciary duties, issue a dilutive option in order to protect the corporation or its minority shareholders from exploitation by a controlling shareholder who was in the process [of] or threatening to violate his fiduciary duties to the corporation . . . ."); *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 659–62, 662 n.5 (Del. Ch. 1988) (Allen, C.) (recognizing that board can, consistent with its fiduciary duties, take action that interferes with stockholder majority given sufficiently compelling justification; suggesting hypothetical that could support action to dilute controller's stake); *see also Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *7–8 (Del. Ch. Aug. 27, 1987) (Allen, C.) ("[*Unocal*] teaches that the powers of the board to deal with perceived threats to the corporation extend, in special circumstances, to threats posed by shareholders themselves and a board may, in such circumstances, take action to protect the corporation even if such action discriminates against and injures the shareholder or class of shareholders that poses a special threat."); *cf. In re Quest Software Inc. S'holders Litig.*, 2013 WL 5978900, at *2–4 (Del. Ch. Nov. 12, 2013) (summarizing special committee's use of dilutive option during go-shop period to counter-balance threat posed by CEO and large blockholder).

[6] Perhaps creative and resourceful advisors could come up with other measures for defending against controllers, just as they have invented many ways of defending against third-party tender offers. Delaware precedents provide some examples. *See, e.g.*, *Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401, 407–08 (Del. 1985) (addressing board's funding of ESOP in response to threat of action by controller); *ODS Techs., L.P. v. Marshall*, 832 A.2d 1254, 1256–57 (Del. Ch. 2003) (noting that company adopted staggered board and supermajority bylaw to delay ability of stockholder to assert powers associated with majority control); *Frankino v. Gleason*, 1999 WL 1032773, at *2 (Del. Ch. Nov. 5, 1999) (describing bylaw amendments adopted by board in anticipation of action by controlling stockholder). The Complaint, however, does not identify anything else the VMware Board could have done. Defense counsel responsibly addressed the two most obvious possibilities.

25

tracking stock, or anything else. Delaware law does not require that directors engage in futile acts. *See In re MFW S'holders Litig.*, 67 A.3d 496, 508 (Del. Ch. 2013) (Strine, C.) (noting that special committee did not have the practical authority to market the company to other buyers because of a dominant stockholder's block and therefore was not obligated to try), *aff'd*, 888 A.3d 635 (Del. 2014).

Without other options, perhaps the VMware Board might have caused VMware to file suit against EMC and Denali and seek injunctive relief against the Merger. There are rare precedents when subsidiaries have litigated against their controllers.[7] The Dual Directors did not do this, but the plaintiff did. Skilled law firms brought this action, and the Complaint presumably contains the strongest causes of action that they could identify. This decision dismisses those claims as non-viable. The Dual Directors cannot be held responsible for failing to pursue legal theories that this decision has dismissed.

The known-looter theory does not support a claim against the Dual Directors. The Dual Directors cannot be held liable for failing to take action against EMC that they had no impetus, justification, or ability to take.

## C. The Merger Agreement Theory

The Complaint's third objection is that the Merger Agreement bound VMware and restricted its operations. Framed as a claim, this objection asserts that EMC breached its

---

[7] *See, e.g.*, *CNX Gas*, 4 A.3d at 413 ("[In 2009,] [t]he iBasis directors filed two lawsuits against [its controlling stockholder] Royal KPN, took one of the lawsuits through trial, and ultimately extracted a price increase from $2.25 to $3 per share."); *Next Level Commc'ns, Inc. v. Motorola, Inc.*, 834 A.2d 828 (Del. Ch. 2003) (denying subsidiary's application for preliminary injunction against controller's unsolicited tender offer).

fiduciary duties by agreeing to provisions in the Merger Agreement that prevented VMware and its fiduciaries from taking action to benefit their stockholders, thereby using VMware as a pawn for its own benefit.

### 1. The Incorrect Premise

As a threshold matter, the VMware-in-shackles theory rests on a mischaracterization of the Merger Agreement. The Complaint asserts that the Merger Agreement imposed contractual restrictions on VMware. It did not. "Only parties to a contract are bound by that contract." *Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 343 (Del. Ch. 2003). VMware was not a party to the Merger Agreement and was not bound by it.

In an effort to avoid this basic fact, the Complaint observes that the Merger Agreement contained provisions that related to VMware. That is true, but those provisions did not bind VMware.

One set of provisions consisted of representations and warranties that EMC made about VMware. Those provisions allocated risk between EMC and Denali by making EMC liable if particular facts about VMware turned out not to be true. *See Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 2142926, at *28 (Del. Ch. July 20, 2007) (Strine, V.C.) (describing role of contractual representations and warranties), *aff'd*, 945 A.2d 594 (Del. 2008).[8] VMware was not obligated to ensure that the representations or

---

[8] *See generally* 1 Lou R. Kling & Eileen T. Nugent, NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES & DIVISIONS § 11.01[1], at 11-7 (2016) [hereinafter "Kling & Nugent"] ("[T]here are three distinct reasons for a Buyer to want a Seller to make representations and warranties in general and any specific one in particular: (1) to assist the Buyer in understanding the business it is acquiring and in doing its due diligence; (2) to allow the Buyer to refuse to close the transaction if the representations are not true at closing; and (3) to enable the Buyer to recover

warranties were accurate, nor did VMware face any exposure if the representations or warranties were inaccurate.

Another set of provisions consisted of covenants regarding VMware. In Section 4.01(b) of the Merger Agreement, EMC agreed not to take certain actions regarding VMware between signing and closing. The section stated, in pertinent part, as follows:

Actions with Respect to VMware. During the period from the date of this Agreement to the Effective Time, except as required by applicable Law, [EMC] shall not, and shall cause any of its Subsidiaries that are record or beneficial owners of shares of VMware Common Stock not to, without Parent's prior written consent . . . :

(i) sell, pledge, dispose of, transfer, abandon, lease or otherwise encumber or subject to any Lien . . . , any shares of VMware Common Stock or any of the VMware Promissory Notes;

(ii) purchase or otherwise acquire any shares of VMware Common Stock other than in order to cause VMware to continue to be a member of the affiliated group of corporations filing a consolidated tax return with the Company for purposes of Section 1502 of the Code and the regulations thereunder;

(iii) convert any shares of VMware Class B Common Stock into shares of VMware Class A stock;

(iv) vote to approve or provide any consent to (A) any action under Article VI of the Amended and Restated Certificate of Incorporation of VMware [the Class B Consent Rights] . . . , (B) any amendment to the VMware Certificate or the Amended and Restated Bylaws of VMware, (C) any sale, transfer, lease or other disposition of all or substantially all of the assets of VMware or (D) any other action submitted to a vote of the VMware stockholders other

---

damages if a representation turns out to have been false when made, whether or not the transaction closes." (citations omitted) (formatting altered)); *id.* § 11.04[5], at 11-40 ("Companies will . . . commonly be asked to make representations concerning their subsidiaries if such entities are being directly or indirectly sold in the transaction . . . .").

than the ratification of the appointment of VMware's independent auditors and the election of directors pursuant to Section 4.01(b)(v);

(v) take any action as a stockholder of VMware to remove or appoint (other than to fill vacancies) any directors of VMware other than the re-election of those Class I Members (as defined in the [Dual-Class Charter]) and Class II (as defined in the [Dual-Class Charter]) directors who will be standing for reelection at the 2016 annual meeting;

(vi) take any other action by written consent as a stockholder of VMware;

(vii) enter into, amend, cancel, supplement or otherwise modify any agreement with VMware or its Subsidiaries other than transactions entered into in the ordinary course of business, consistent with past practice . . . ; or

(viii) authorize any of, or commit, resolve or agree to take any of, the foregoing actions.

Merger Agreement § 4.01(b).

None of these covenants bound VMware. Each imposed a contractual restriction on EMC regarding an action that EMC had the ability to take in its capacity as a stockholder of VMware. Each of the restricted actions involved the exercise of a voting right or consent right that EMC possessed in its capacity as a stockholder. Each was something that EMC could do or not do by itself. None required that EMC act through VMware, whether by causing the Dual Directors to take action or otherwise. From VMware's standpoint, EMC's covenants did not change anything. VMware had precisely the same flexibility to act after the Merger Agreement was signed as it would have had without the Merger Agreement. For each subject covered by Section 4.01(b), VMware always could act only if it received EMC's consent. The Merger Agreement affected how EMC could exercise its own rights. It did not impose any additional restrictions on VMware.

29

Finally, the Complaint focuses on a no-shop provision in Section 4.02 of the Merger Agreement. According to the Complaint, this provision restricted VMware's ability to sell itself. That is a striking misstatement. Section 4.02(g) clearly and expressly excluded VMware from the restrictions in the no-shop provision. The claimed restriction did not exist.

All of the provisions in the Merger Agreement bound EMC, which was a party to that agreement. None of them bound VMware, which was not. The factual premise for the restrictive-agreement theory does not exist.

## 2.    The Claim Against EMC

Without the faulty premise that the Merger Agreement bound VMware, the Complaint cannot state a claim for breach of fiduciary duty against EMC based on the provisions in the Merger Agreement.

> Stockholders in Delaware corporations have a right to control and vote their shares in their own interest. They are limited only by any fiduciary duty owed to other stockholders. It is not objectionable that their motives may be for personal profit, or determined by whim or caprice, so long as they violate no duty owed other shareholders.

*Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987). Appling this principle, Delaware courts consistently have held that a controlling stockholder's fiduciary duty does not constrain its ability to vote its shares.[9]

_____

[9] *See, e.g.*, *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 444 (Del. 1996) ("Because the alternative transaction would have been covered by [DGCL] § 271, the Eriksons had the statutory right as [controlling] shareholders to veto this transaction."); *Williams v. Geier*, 671 A.2d 1368, 1380–81 (Del. 1996) ("Stockholders (even a controlling stockholder bloc) may properly vote in their own economic interest[.]"); *Tanzer v. Int'l Gen. Indus., Inc.*, 379 A.2d 1121, 1123 (Del. 1977) ("[W]e are well aware that a majority stockholder has its rights, too. And among

Each commitment that EMC made in Section 4.01(b) of the Merger Agreement related to EMC's exercise of a voting right or consent right that belonged to EMC in its capacity as a stockholder. EMC violated no duty to VMware or its minority stockholders by exercising those rights as it wished. EMC similarly violated no duty by committing itself contractually to exercise its rights in a manner that furthered EMC's business objective of completing the Merger. The Complaint's allegations against EMC regarding the Merger Agreement fail to state a claim on which relief can be granted.

### 3. The Claim Against The Other Defendants

The Complaint also attempts to turn the VMware-in-shackles theory into a claim against the other defendants. To reach Denali and its affiliates, the Complaint asserts that they aided and abetted EMC's breach by demanding the provisions in the Merger Agreement that the Complaint attacks. A claim for aiding and abetting requires an underlying breach of fiduciary duty. *See Malpiede*, 780 A.2d at 1096. Because the theory does not state a claim against the fiduciary (EMC), it does not state a claim against the alleged aiders and abetters (Denali and its affiliates).

---

these is exercising a fundamental right of a stockholder in a Delaware corporation; namely, the right to vote its shares."), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983); *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1041 (Del. Ch. 2012) (Strine, C.) ("[C]ontrollers have a right to vote their shares in their own interest."); *Emerson Radio Corp. v. Int'l Jensen Inc.*, 1996 WL 483086, at *17 (Del. Ch. Aug. 20, 1996) ("But even if Shaw and Blair Fund were Jensen's 'controlling' stockholder, they violate no fiduciary duty by opposing Emerson's proposal or by supporting Recoton's, because even a majority stockholder is entitled to vote its shares as it chooses, including to further its own financial interest.").

31

To reach the Dual Directors, the Complaint asserts that the VMware Board should have taken some action to defend VMware against EMC's exercise of its rights. As discussed previously, the Complaint does not support a reasonable inference that the sale of EMC constituted a threat to VMware. Nor has the Complaint identified anything that the VMware Board could have done if the directors had reasonably perceived a threat. The Complaint therefore does not state a claim against the Dual Directors.

## D. The Restructuring Theory

The Complaint's next objection focuses on the restructuring of VMware's operations after EMC entered into the Merger Agreement with Denali, including the layoffs and executive departures. The Complaint posits that EMC disloyally caused VMware to restructure its operations, even though the restructuring harmed VMware, as part of a *quid pro quo* in return for Denali agreeing to acquire EMC.

Delaware law "presumptively considers equal treatment as a safe harbor and immunizes the [challenged] transaction because it allows all the stockholders to share in the benefits of a transaction equally with the large blockholder." *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 663 (Del. Ch. 2013) (Strine, C.). "This notion stems from the basic understanding that when a stockholder who is also a fiduciary receives the same consideration for her shares as the rest of the shareholders, their interests are aligned." *Synthes*, 50 A.3d at 1035.

The equal-treatment principle is not an absolute rule because there may be times when a controller has a unique interest that causes it to favor a transaction that is disadvantageous, or relatively less advantageous, for the minority. One frequently

32

mentioned example is a need for personal liquidity.[10] It is not enough, however, for a plaintiff simply to argue in the abstract that a controller possessed and pursued a divergent interest. The complaint must plead facts sufficient to support a reasonable inference that the controller in fact fell prey to a conflict in the specific case.[11]

The Complaint alleges that EMC caused VMware to fire 800 VMware employees, representing nearly 5% of its workforce, and to take an earnings charge of $55 to $65 million. VMware also announced the resignations of three of its senior officers. *See* PAB at 20–21, 28; Compl. ¶¶ 103–06. These actions fall within the protection of the equal-

---

[10] *See, e.g.*, *McMullin v. Beran*, 765 A.2d 910, 922–23 (Del. 2000) (reversing grant of motion to dismiss where complaint alleged that controlling stockholder and its director designees sacrificed value in sale to achieve controlling stockholder's goal of obtaining near-term liquidity and significant component of transaction consideration was cash); *N.J. Carpenters Pension Fund v. Infogroup, Inc.*, 2011 WL 4825888, at *4, *9–10 (Del. Ch. Sept. 30, 2011) (denying motion to dismiss where plaintiff alleged that director who was also large stockholder sacrificed value in sale because he needed liquidity to satisfy personal debts and fund a new venture); *see also In re TeleCorp PCS, Inc. S'holders Litig.*, Cons. C.A. No. 19260–VCS, at 16 (Del. Ch. June 17, 2002) (TRANSCRIPT) (Strine, V.C.) ("What [these large stockholders] weren't entitled to do was to use their influence as fiduciaries to procure liquidity from AT&T Wireless on the backs of public stockholders in an unfair merger.").

[11] *See Chen v. Howard-Anderson*, 87 A.3d 648, 672 (Del. Ch. 2014) (dismissing claims against directors who were affiliated with private equity funds where plaintiffs did not adequately support assertion that funds faced liquidity issues); *Morton's*, 74 A.3d at 667 (dismissing complaint challenging sale that was product of lengthy and thorough pre-signing market check in which plaintiff conceded that "all logical buyers were made aware . . . and that they all had the time and fair opportunity to bid"; rejecting allegation that private equity firm "typically flips companies it invests in every three to five years" and favored sale to achieve liquidity for investors in one of its funds and invest in new fund); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 54 (Del. Ch. 2013) ("At trial, the plaintiff could not rely on general characterizations of the VC ecosystem. The plaintiff had to prove by a preponderance of evidence that Prang was not disinterested or independent in this case.").

treatment rule. The consequences of the restructuring fell on VMware as a whole and affected all of its stockholders, including EMC, proportionately. The equal-treatment safe harbor therefore presumptively applies.

The Complaint does not identify any divergent interest that EMC might have such that equal treatment would have affected EMC differently than other stockholders. The plaintiff argues in conclusory fashion that EMC caused VMware to engage in a restructuring "to facilitate [Denali's] agenda." PAB at 26–27. As the largest ongoing investor in VMware, Denali had the most to gain, and the most to lose, from the restructuring. The Complaint does not identify any way in which the changes benefited Denali at the expense of VMware or its minority stockholders. The notion of EMC serving Denali's agenda therefore does not take the restructuring out of the equal-treatment safe harbor.

The business judgment rule protects the restructuring. The allegations relating the restructuring do not give rise to a claim.

## E. The Tracking Stock Theory

The theory that gets the most airtime in the Complaint and in the plaintiff's brief is the assertion that Denali's issuance of the Class V stock harmed VMware and its minority stockholders. The plaintiff advances this theory in three forms. One version is that the Class V shares were a tax dodge that imposed on VMware the risk of a large contingent tax liability. Another is that the Class V shares should be regarded by a court of equity as a VMware security rather than a Denali security. From this strained premise, the plaintiff argues that EMC misappropriated VMware assets to finance the Merger. A third version is

34

that the Class V shares will compete in the market with VMware Class A stock, diluting the value of the latter by pushing down its per-share market price. None of these variants states a viable claim.

### 1. The Class V Shares As Tax Dodge

In its first incarnation, the tracking stock is depicted as a tax dodge that imposed risks on VMware and its stockholders for which they were not compensated. As the plaintiff puts it, the tracking stock "permitted EMC to save billions in taxes while creating tax risks for VMware." PAB at 25; *see* Compl. ¶¶ 65–72. The gist of this theory is that by issuing the Class V shares, Denali and EMC could treat at least that part of the merger consideration as a tax-free exchange. The plaintiff believes there is a risk that the Internal Revenue Service might disagree with this characterization and require EMC or its former stockholders to pay taxes on a capital gain derived from a constructive sale of EMC's stake in VMware. *See* Compl. ¶ 70.

The parties have not provided meaningful briefing on the underlying tax issue, and this decision need not express any opinion on it. What matters for present purposes is that the Complaint and the plaintiff's brief lack any explanation whatsoever as to why this structure created tax risk for VMware or the holders of VMware's Class A stock. One can assume for the sake of argument that the allegations of the Complaint support a reasonable inference that the structure of the Merger created tax risk for EMC and its former stockholders. That does not mean that the structure of the Merger created any tax risk for VMware or VMware's minority stockholders.

35

The Complaint's allegations on this point are conclusory. The Complaint alleges that

> [i]n the event the IRS does not treat the Merger as a Section 351 exchange . . . , EMC will be forced to carry a multi-billion dollar tax liability that may be allocated to Denali's economic interest in the VMware business, known as the "Class V Group," pursuant to the Denali Tracking Stock Policy. Indeed, it is very possible that because this tax strategy is so risky that, after it has already caused great harm to VMware and its public stockholders, it will have to be altered or abandoned.

*Id.* ¶ 76. But as this allegation states, any tax liability would belong to EMC. The Complaint does not explain how VMware might end up bearing the burden of that liability. Perhaps the plaintiff cynically expects Denali to force VMware to pay it. If so, then that future transaction might constitute an act of self-dealing by a controlling stockholder that VMware or a VMware stockholder could challenge. At present, it is a hypothetical possibility that is neither contemplated nor threatened. To the extent the Complaint relies on a tax liability theory, it is dismissed for failure to state a claim on which relief could be granted.

### 2. The Class V Shares As A VMware Security

In a second attack on the tracking stock, the Complaint asserts that the Class V shares that Denali issued should be regarded in substance as a form of VMware stock. From this dubious assumption, the plaintiff argues that by agreeing in the Merger Agreement that Denali could issue the Class V shares as part of the merger consideration, EMC effectively misappropriated VMware's assets to finance the Merger. This idea is as hard to grasp as it is to express, so it is best to quote from the plaintiff's brief:

36

> EMC essentially used its control position in VMware as a source of $18 billion in equity funding to facilitate the sale of EMC to Dell. . . . EMC's use of its VMware control position is very direct: its shares of VMware were used as currency to fund the Merger. The control position in VMware is the economic and legal basis for the Tracking Stock—absent EMC's transfer of its controlling stock in VMware, Denali could not issue the Tracking Stock. . . . The fact that EMC used Denali to accomplish the creation of a competing stock representing an economic interest in VMware is a matter of form, not substance. Equity will not allow EMC to evade its fiduciary duty by dressing up an impermissible creation of additional economic interests in VMware in the form of Denali Tracking Stock.[12]

The Complaint even goes so far as to allege that the issuance of the Class V stock inflicts "adverse effects on the capital structure of VMware." *Id*. ¶ 45.

This theory is nonsensical. The Class V stock is an equity security created and issued by Denali, not VMware. The terms of the Class V stock are set forth in Denali's Fourth Amended and Restated Certificate of Incorporation, which was adopted in connection with the Merger. *See* Merger Agreement, Ex. C (the "Denali Charter"). Section 5.2 of the Denali Charter states that "[t]here shall be five series of Common Stock created, having the number of shares and the voting powers, preferences, designations, rights, qualifications, limitations or restrictions set forth below." Section 5.2(b) of the Denali Charter establishes the Class V stock as one of those series:

> **Class V Common Stock**. One series of common stock of the Corporation is hereby created and designated as "Class V Common Stock" consisting of three-hundred, forty-three million, twenty-five thousand, three hundred and

---

[12] PAB at 25–26. See Compl. ¶ 2 (describing the Class V stock as "a bizarre tracking stock that will be issued by Denali, but will convey an economic interest in VMware's stock and business"); *id.* ¶ 48 (asserting that "the Tracking Stock, like VMware's Class A, will primarily represent an economic interest in VMware"); *id.* ¶ 52 (alleging that the tracking stock "is said to carry with it the economic interest in the business of VMware").

eight (343,025,308) shares, par value $0.01 per share (the "Class V Common Stock"). Each share of Class V Common Stock shall be identical in all respects and will have equal rights, powers and privileges to each other share of Class V Common Stock.

The Class V stock is not part of VMware's capital structure. It does not appear in the Dual-Class Charter. It does not represent an equity interest in VMware and does not have any claim on its cash flows.

The fact that the Class V stock is a tracking stock does not change the fact that it is a Denali security. "Tracking stocks are issued by corporations to provide holders of these securities with interests in a specific discrete subsidiary, division, or business of the corporation." R. Franklin Balotti & Jesse A. Finkelstein, 1 DELAWARE LAW OF CORPORATIONS & BUSINESS ORGANIZATIONS § 5.4, at 5-10 (2014). The tracking stock is a derivative security that derives its value from the performance of another asset. In this case, the other asset is a block of VMware stock, but that does not turn the Denali stock into VMware stock.

The Class V stock tracks the value of Denali assets called the "Class V Group." The Denali Charter defines this term as follows:

(i) the direct and indirect economic rights of the Corporation in all of the shares of common stock of VMware owned by the Corporation as of the Effective Date;

(ii) all assets, liabilities and businesses acquired or assumed by the Corporation or any of its Subsidiaries for the account of the Class V Group, or contributed, allocated or transferred to the Class V Group (including the net proceeds of any issuances, sales or incurrences for the account of the Class V Group of shares of Class V Common Stock or indebtedness attributed to the Class V Group) . . .; and

38

(iii) all net income and net losses arising in respect of the foregoing, including dividends received by the Corporation with respect to the common stock of VMware and the process of any Disposition of any of the foregoing . . . .

Denali Charter art. XV, at 26–27. The provisions governing the Class V stock state that Denali only can pay dividends using funds that are legally available from the Class V Group. *Id.* § 5.2(e). In liquidation, by contrast, after the payment of any preferences, the Class V Group participates equally with other holders of Denali common stock. *See id.* § 5.2(f). In either case, the Class V Group only has a claim on Denali assets. It does not have any claim on VMware or VMware assets.

Denali did not misappropriate any assets of VMware when it issued a tracking stock on the strength of the VMware stock that Denali's Class V Group owned. Shares of stock that a Delaware corporation has issued belong to the biological and artificial persons who own the shares, not the corporation that issued them. Section 159 of the DGCL states that "[t]he shares of stock in every corporation shall be deemed personal property and transferable as provided in Article 8 of subtitle I of Title 6." 8 *Del. C.* § 159. The underlying shares of VMware stock that Denali owned through the Class V Group were the personal property of Denali. They did not belong to VMware. When Denali issued the Class V tracking stock, it issued a class of Denali stock supported by assets that Denali owned.

The Complaint's theory that the Class V stock is really VMware stock ignores all of this. To the extent the Complaint relies on this theory, it is dismissed for failure to state a claim on which relief could be granted.

### 3. The Dilution Theory

The Complaint's third and final theory is that Denali's issuance of the tracking stock diluted the value of the VMware Class A stock. The issuance of the tracking stock was not wrongfully dilutive.

### a. Traditional Dilution

A traditional dilution claim requires that an entity issue equity that reduces the relative ownership or voting power of the pre-issuance holders. *See El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1251, 1264 (Del. 2016). When the former equity holders own "the same ownership percentage . . . before and after [a] transaction[,] . . . it is not reasonably conceivable that the [p]laintiffs suffered dilution of their interests." *Thermopylae Capital P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *17 (Del. Ch. Jan. 29, 2016).

In this case, no dilution in the traditional sense occurred. VMware did not issue any new shares. The holders of VMware Class A stock owned the same percentage of VMware and controlled the same limited percentage of its voting power after the Merger as they did before it. Denali owned the same block of shares that EMC held previously. That block was privately held before the Merger, and it remained privately held afterwards. The only change was that after the Merger, Denali had issued the Class V stock to track the value of 65% of the block. That issuance did not have any effect on VMware, the ownership interest reflected by the Class A stock, or the voting rights of the Class A stock. Under traditional principles, the Complaint's dilution theory fails to state a claim.

### b.     Market Value Dilution

Abandoning traditional principles, the Complaint focuses on the decline in the market price of the publicly traded VMware Class A stock that resulted from Denali's issuance of the Class V stock. In simple economic terms, the Denali Class V stock provided a close substitute for the VMware Class A stock. The demand curve for shares of VMware Class A stock, like the demand curve for virtually any other asset, is downward sloping and elastic.[13] When those conditions hold, a greater supply of the asset, including close substitutes, causes the price of the asset to decline. The Complaint supports a reasonable inference that the issuance of the Denali Class V common stock depressed the market price of the VMware Class A stock. For simplicity, this decision will refer to this new theory of dilution as "market price dilution."

---

[13] *See, e.g.*, Andrei Shleifer, *Do Demand Curves for Stocks Slope Down?*, 26 J. FINANCE 579 (1986) (using data showing that share prices increase when a company announces its inclusion in the S&P 500 to support conclusion that the demand curve for shares is downward-sloping); Eric J. Levin & Robert E. Wright, *Downwards Sloping Demand Curves for Stock?* (CTR. FOR ECON. POL'Y RES. & INST. FOR THE STUDY OF LABOUR Nov. 2001), *available at* https://www. researchgate.net/profile/Robert_Wright9/publication/46546108_Downwards_sloping_demand_ curves_for_stock/links/0912f509cd3d621258000000/Downwards-sloping-demand-curves-for-stock.pdf (last accessed Mar. 30, 2017) (using data from the London Stock Exchange to model demand after new information entered the market and measuring "price effects . . . almost identical to the [event-based] price effects actually observed" by Shleifer and other scholars); Paul Schultz, *Downward Sloping Demand Curves, the Supply of Shares, and the Collapse of Internet Stock Prices*, at 2 (2006), *available at* https://www3.nd.edu/~pschultz/lockup_expirations_paper_ 20060306.pdf (last accessed Mar. 30, 2017) (finding that "individual internet stocks with lock-up expirations earn market-adjusted returns of -7.3% in the six days ending on the lock-up expiration" and concluding that "an increase in the supply of shares does have an impact on prices of individual internet stocks").

The Complaint's theory of market price dilution does not state a claim against either EMC or Denali because neither exercised power as a controller when taking the actions that resulted in the market price dilution.[14] "[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer *or controlling shareholder* and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (emphasis added). This fiduciary principle generally applies to a controlling stockholder only when the controller utilizes the corporate machinery to take action:

> [W]hen a shareholder, who achieves power through the ownership of stock, exercises that power by directing the actions of the corporation, he assumes the duties of care and loyalty of a director of the corporation. When, on the other hand, a majority shareholder takes no such action, generally no special duty will be imposed.

*Cinerama, Inc. v. Technicolor, Inc.*, 1991 WL 111134, at *19 (Del. Ch. June 24, 1991) (Allen, C.), *aff'd in part, rev'd in part on other grounds sub nom*. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993). "A controller cannot be liable for breaching fiduciary duties owed to minority holders unless it uses its control to direct the actions of the entity it controls against the interests of that minority." *Hite Hedge LP v. El Paso Corp.*, 2012 WL 4788658, at *3 (Del. Ch. Oct. 9, 2012). In other words, when a controlling

---

[14] The plaintiff appears to contend that both EMC and Denali acted as controlling stockholders in connection with the issuance of the Class V stock because the time line that started with the discussion of the idea and ended with the issuance of the shares covered a period when control shifted from EMC to Denali. The plaintiff also advances the aggressive theory that Denali became EMC's controller and VMware's *de facto* controller when EMC and Denali entered into the Merger Agreement. Because the market price dilution theory does not state a claim regardless of which entity was the controller, this decision passes over these issues.

stockholder acts purely in a stockholder capacity, the controlling stockholder generally does not owe fiduciary duties and can act in its self-interest. *See Buttonwood*, 2015 WL 6437218, at *1.

The issuance of the tracking stock did not involve EMC or Denali exercising any power over VMware. It only required that EMC and Denali agree about how to use personal property—a controlling block of shares in VMware—that initially belonged to EMC and passed to Denali as a result of the Merger. Once the Merger closed, Denali exercised its power over its own personal property and its own capital structure to issue shares of its own stock. None of this required any action by VMware, the VMware Board, or any VMware officer. Consequently, neither EMC nor Denali violated any fiduciary duty in the course of events leading up to and including the issuance of the Class V stock. The market price dilution theory does not state a claim against them.[15]

---

[15] This decision should not be read as holding that a controller can never face a claim under Delaware law for breach of fiduciary duty for issuing shares that were a near substitute for a controlled corporation's equity. One possibility might be if a controller possessed inside information about the controlled company which indicated that it was a particularly advantageous time to issue shares. Such a theory would resemble a traditional *Brophy* claim, in which a fiduciary misappropriates an asset belonging to the corporation (private information) and uses it selfishly by trading in the market for the fiduciary's personal benefit. *See Brophy v. Cities Serv. Co.*, 70 A.2d 5, 7 (Del. Ch. 1949). In my view, the claim would be strongest if the controller's issuance deprived the controlled entity of a chance to raise capital, thereby effectively usurping a corporate opportunity and harming the controlled entity. Under the Delaware Supreme Court's most recent clarification of *Brophy*, however, the claim could give rise to a disgorgement remedy even without harm to the controlled entity. *See Kahn v. Kolberg Kravis Roberts & Co.*, 23 A.3d 831, 838 (Del. 2011). In any event, it would require the misuse of private information belonging to the controlled entity—the crux of a *Brophy* claim—which is not alleged here. *See In re Molycorp, Inc. S'holder Deriv. Litig.*, 2015 WL 3454925, at *9 (Del. Ch. May 27, 2015) (dismissing claim that controllers deprived company of opportunity to raise capital by selling their own shares in secondary offering where sellers did not misuse private information in timing sale).

43

The market-price-dilution theory also does not support a claim against the Dual Directors. In theory, a stockholder might state a claim against a controlled subsidiary's board of directors if they could have defended the subsidiary and its minority stockholders against the controller yet declined to do so for disloyal reasons. *See Unocal*, 493 A.2d at 954. But the Complaint's allegations do not support an inference of disloyal inaction. For the reasons discussed earlier in this decision, although the Complaint posits that the VMware Board should have taken some action to defend VMware, the Complaint does not identify anything that the VMware Board could have done such that an inference of disloyal inaction might arise. The theory therefore fails.

## F. Other Objections

The plaintiff's answering brief does not meaningfully discuss several additional objections that appear in the Complaint. "Issues not briefed are deemed waived." *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999).

The answering brief does not mention at all the Complaint's objection that EMC should have asserted that the negative consequences VMware suffered rose to the level of a "material adverse effect" that would have given EMC grounds to terminate the Merger Agreement. *See* Compl. ¶¶ 112–14. Any claim based on this objection has been waived.

The answering brief only mentions in passing the abandoned Virtustream joint venture. It cites the joint venture as an example of the type of unfavorable transactions that the plaintiff fears Denali will impose on VMware, but the brief does not rely on the joint

venture when articulating the plaintiff's legal theories. *See* PAB at 16–17. Any claim based on the Virtustream joint venture has been waived.

The answering brief points out at several points that VMware repurchased shares during the period when its stock price was depressed. Delaware has extensive case law addressing the availability of a claim for breach of fiduciary duty when a corporation or its fiduciaries trade in the corporation's shares. The plaintiff has not cited any of the relevant cases, much less attempted to grapple with their implications. The plaintiff also has not attempted to take into account that VMware's remaining Class A stockholders benefitted from VMware purchasing its shares when the stock price was low, or that a stockholder who sells his shares voluntarily and with full disclosure of all material information generally gives up any Delaware law claims for breach of fiduciary duty that the stockholder previously possessed.[16] By not making any effort to engage with the pertinent authorities, the plaintiff has waived any claim based on VMware's repurchases of its Class A stock.

---

[16] *Cf. In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1043–57 (Del. Ch. 2015) (explaining mechanisms by which Delaware claims pass to successor holders); *In re Triarc Cos. Class & Deriv. Litig.*, 791 A.2d 872, 875 (Del. Ch. 2001) (explaining that stockholders who sells their shares choose "to dissociate their economic interests from the corporation and, by doing so, to forego the opportunity to benefit from . . . the potential benefit to the corporation from the derivative claims"); *In re Prodigy Commc'ns Corp. S'holders Litig.*, 2002 WL 1767543, at *4 (Del. Ch. July 26, 2002) ("[W]hen Beoshanz sold his shares in the marketplace, the claim relating to the fairness of the then-proposed transaction passed to his purchaser, who enjoyed the benefits of the settlement."); *In re Sunstates Corp. S'holder Litig.*, 2001 WL 432447, at *3 (Del. Ch. Apr. 18, 2001) ("I can see little reason why the claim for breach of the preferred stock charter provisions would not ordinarily transfer with the shares.").

## III.    CONCLUSION

None of the Complaint's objections to the Merger Agreement or the Merger support

a claim on which relief can be granted. This action is dismissed pursuant to Rule 12(b)(6).

46